[Cite as *State v. Davenport*, 2018-Ohio-2933.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 106143

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**CHARLES H. DAVENPORT**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-600942-A

**BEFORE:** Boyle, P.J., S. Gallagher, J., and Jones, J.

**RELEASED AND JOURNALIZED:** July 26, 2018

**ATTORNEYS FOR APPELLANT**

Russell S. Bensing
Scott J. Friedman
600 IMG Building
1360 East Ninth Street
Cleveland, Ohio   44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Brian D. Kraft
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

**{¶1}** Defendant-appellant, Charles H. Davenport, appeals his conviction and raises the following assignment of error for our review:

> The defendant was denied the effective assistance of counsel, in derogation of his rights under the Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution.

**{¶2}** Finding no merit to his assignment of error, we affirm.

## I. Procedural History and Factual Background

**{¶3}** On November 16, 2015, a Cuyahoga County Grand Jury indicted Davenport for two counts of aggravated murder in violation of R.C. 2903.01(A) and (B), one count of murder in violation of R.C. 2903.02(B), two counts of aggravated arson in violation of R.C. 2909.02(A)(1) and (2), and one count of felonious assault in violation of R.C. 2903.11(A)(1).[1]

**{¶4}** On January 13, 2016, Davenport's trial counsel filed a motion with the court to appoint an independent psychological expert for assistance. Davenport's trial counsel argued that a psychological expert was necessary to assist them in effectively representing Davenport, who had a "history of psychiatric and/or psychological treatment." The state opposed the motion, arguing that Davenport was not entitled to an independent evaluation by a psychological expert at the state's expense because he had yet to undergo an initial examination by the court psychiatric clinic.

**{¶5}** The trial court granted Davenport's motion over the state's objection and appointed Dr. James J. Karpawich who drafted a detailed report that was included in the record

---

[1]At trial, the state amended Count 2 for aggravated murder in violation of R.C. 2903.01(B), striking the language "and/or felonious assault in violation of Revised Code 2903.11(A)(1)" from the indictment.

as defendant's Exhibit A.  In his report, Dr. Karpawich reviewed records from Cuyahoga County Jail, records from the Cuyahoga County Court website, records from the medical centers and hospitals where Davenport received mental health treatment, and results from psychological tests.  The report described Davenport's background information, mental health and medical history, alcohol and drug history, legal history, and psychological state.

{¶6}    Before trial, the state and Davenport's trial counsel agreed to stipulate to Dr. Karpawich's finding in his report that Davenport was competent.[2]   During the hearing, the following exchange took place:

DEFENSE
COUNSEL:    In an abundance of caution we will stipulate to that report, wherein Dr. Karpawich opined that our client, Mr. Davenport, is competent.

* * *

STATE:    Your Honor, the State likewise would stipulate to that report and findings.

COURT:    That report was in August. Is there anything in your discussions with Mr. Davenport [that] would lead you to believe that he has regressed in any way or anything?

---

[2] Davenport had different trial counsel throughout the pretrial proceedings and trial itself. The court appointed two attorneys to represent Davenport on November 19, 2015; however, on June 20, 2016, one of those attorneys withdrew as counsel after he was "hired by the United States Social Security Administration to serve in the capacity of Administrative Law Judge," which required him "to immediately withdraw from all active cases in order to serve in that capacity." On August 20, 2016, the second attorney passed away.

The court subsequently appointed two more attorneys as Davenport's trial counsel.   Despite the last minute change in counsel, during a pretrial hearing, the trial court stated, "Mr. Davenport, let me tell you something.   You got two real good attorneys here.   Both of them have many years of trial experience.   Both of them are totally respected by the Court, the prosecution and the Defense Bar in general.   These are two good attorneys here."

| | | |
|---|---|---|
| DEFENSE COUNSEL: | No. | |
| COURT: | So we will have a stipulation as to the competency and the sanity of the defendant? | |
| STATE: | I don't think sanity was ever addressed, your Honor. It was just strictly competency, I believe, was the only issue that was addressed. | |

{¶7} Also before trial, Davenport then waived his right to a trial by jury in open court and in writing. The trial court journalized Davenport's waiver of his right to a trial by jury on May 31, 2017.

{¶8} On June 1, 2017, the matter proceeded to a bench trial, during which the state called nine witnesses, including numerous officers who responded to the scene, neighbors, and relatives of the victim, Roman Sparks, whose house Davenport set fire to and who died as a result.

{¶9} The underlying facts of the case are undisputed. On November 4, 2015, Charles Winters was sitting with Sparks and a woman on Sparks's front porch when he saw Davenport walk past Sparks's home into an adjacent alley. Davenport, who neighbors stated had mental health issues, went into the alley to go to the bathroom. According to Winters, Sparks became upset and "start[ed] giving [Davenport] a hard time for what he was doing." Angered by Sparks's comments, Davenport began walking toward Sparks's front porch. Sparks "told [Davenport that] if he kept coming across the street, he would shoot him." Sparks then pulled out a gun, pointed it at Davenport, and threatened him. In response, Davenport "told him do not pull out a gun on me again, I will burn you in your sleep." Sparks then made a racially-charged insult toward Davenport, who then left.

{¶10} Later that afternoon, Carl Hardin, who lived in the neighborhood and knew Davenport and Sparks, saw Davenport at a nearby gas station. Hardin testified that Davenport told him to tell Sparks to stop threatening him or he was "going to do something to [Sparks]." Despite Davenport's statement, Hardin said that Davenport appeared "normal."

{¶11} Around 1:00 a.m. on November 5, Davenport knocked on the door of Tammy Mahone, who lived across the street from Sparks with her son, Ryan. According to Mahone, Davenport appeared "out of his mind" and asked her to have Ryan move his truck that was parked next to Sparks's house. Mahone testified that Davenport said he wanted to "burn up" Sparks's house "[b]ecause Rome pulled a gun on him." She stated that she told Davenport that Ryan was sleeping and also told him to "sleep off * * * whatever was bothering him." She testified that Davenport then left. Mahone testified, however, that Davenport returned a second time about an hour and a-half later and made the same request, which she again denied. She said that Davenport returned a third time, around 5:00 a.m., about two hours after his second visit. She stated that Ryan answered the door during Davenport's third visit, moved his truck, and returned home.

{¶12} A few hours after the interaction between Sparks and Davenport and sometime in the early hours of November 5, Winters testified that he saw Davenport attempting to light Sparks's house on fire by "pouring gas on the bushes next to the house." Winters said that he told Davenport to stop and, after Davenport walked away, went back inside his home.

{¶13} Later that same morning, police officers were dispatched to Roman Sparks's house. When they arrived, the house was on fire and emergency personnel had transported Sparks to a nearby hospital, where he was pronounced dead. Evidence presented at trial established that Sparks died of smoke inhalation. Sparks's dog also died of smoke inhalation.

**{¶14}** Numerous officers testified that, upon arriving at the scene, Davenport, who was not wearing a shirt, emerged from the alleyway across the street from Sparks's house and admitted to setting the fire. While the officers initially ignored Davenport's statements, they eventually detained him after confirming that the house was occupied and after the crowd started to become "agitated" at Davenport. Around the same time, two of Sparks's relatives arrived on the scene and asked what happened, to which Davenport responded, "I did it, I poured gas on his porch, I lit it on fire and I stood there and watched them bring his dead body out."

**{¶15}** Later, but still at the scene, officers read Davenport his *Miranda* rights. Davenport then "said he already knew what was going on and [] broke everything down on what he did." Davenport explained that Sparks "pulled a gun on him for the second time." He said that Sparks "threatened [his] life with a pistol" and that he "was not going to play with anybody like that." Davenport stated that he threatened Sparks and then went to the gas station to get gas to start the fire. He said that he told multiple people in the neighborhood that he was planning to set fire to Sparks's house. He also freely admitted that he set the fire after making "several attempts" with paper and his shirt and that the fire was "premeditated."

**{¶16}** During his conversation with police, Davenport also stated that some of the police officers looked familiar because he was "in and out of nut houses." He told officers that he "was a cutter" and was "psychotic." He also informed the officers that he was just released from MetroHealth hospital less than a week earlier.

**{¶17}** Footage from police officers' body cameras shows that Davenport was calm and cooperative when officers detained him and when he explained what happened to the officers. Officers stated that Davenport did not attempt to flee and was not combative when police arrived on the scene.

{¶18} Officers also investigated the alley where Davenport claimed to have watched the house burn. There they found and collected Davenport's shirt, a gas can, a plastic bottle containing gasoline, and beer. Officers then transported Davenport to jail. At the jail, officers collected Davenport's clothes, which had traces of accelerant.

{¶19} Detectives from the Cleveland Homicide Unit subsequently interviewed Davenport later that day on November 5, 2015. During the interview, Davenport stated that he confessed to the police officers on scene, but that he did not "want to get too much further into it without a lawyer." He then stated that he "did the crime" and that there "was no use in hiding or trying to deny it." Davenport then asked the detective if he would receive capital punishment and stated that it would be "understandable. A life for a life, ya know." Davenport also told detectives that after he purchased the gas but before he lit the fire, he "started drinking real heavy" and did "a ton of cocaine."

{¶20} After the state rested, Davenport moved for a dismissal of all charges under Crim.R. 29 as to Counts 1 and 2 for aggravated murder and Count 6 for felonious assault, arguing that the evidence presented showed that Davenport was "in a rage" and, therefore, did not establish that Davenport acted "purposely" as required for a charge of aggravated murder. As to Count 6, Davenport's trial counsel argued that that count should merge with Count 3 for murder. The trial court denied his motion. Davenport rested his case without presenting any witnesses and again moved for dismissal under Crim.R. 29, which the court again denied.

{¶21} The trial court found Davenport guilty of all counts. It found that the counts for aggravated murder and aggravated arson merged and the state elected to proceed on aggravated murder in violation of R.C. 2903.01(A). The court also found that the count for aggravated

arson in violation of R.C. 2909.02(A)(1) merged with the count for felonious assault, and the state elected to proceed on aggravated arson.

{¶22} The court referred Davenport to the court's psychiatric clinic for "psychiatric recommendations regarding disposition."

{¶23} At the sentencing hearing, the court sentenced Davenport to life in prison without eligibility for parole for 25 years for his conviction of aggravated murder and five years for his conviction for aggravated arson, which was to run consecutively to his life term.

## II. Law and Analysis

{¶24} In his sole assignment of error, Davenport argues that he was denied the effective assistance of counsel, specifically pointing to his trial counsel's failure to "investigate the issue of [Davenport's sanity]" and "pursue an insanity defense," which according to him, was "the only defense which had any possibility of success."

{¶25} The burden is on appellant to prove ineffectiveness of counsel. *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. To show prejudice, a defendant must establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688, 694;

*Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

**{¶26}** Trial counsel is strongly presumed to have rendered adequate assistance. *Id.* at 699. "Trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, ¶ 23, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980). Additionally, the failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial. *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 37.

**{¶27}** "In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland* at 695.

**{¶28}** "If the 'facts and circumstances indicate that a plea of not guilty by reason of insanity ["NGRI"] would have had a reasonable probability of success, it is ineffective assistance of counsel to fail to enter the plea.'" *State. v. Gilmore*, 8th Dist. Cuyahoga No. 103479, 2016-Ohio-4697, ¶ 8, quoting *State v. Allen*, 8th Dist. Cuyahoga No. 91750, 2009-Ohio-2036. "Where, however, the facts indicate that counsel was pursuing a reasonable strategy in failing to so plead, or where the likelihood of success for the plea is low, counsel's actions will not be determined to be unreasonable." *Id.*, citing *Allen*. Put simply, even if Davenport's trial counsel failed to "investigate the issue of [Davenport's] sanity," that failure only constitutes ineffective assistance of counsel if the record establishes that a NGRI plea would have had a reasonable probability of success.

**{¶29}** "A person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves [by a preponderance of the evidence] that at the time of the commission

of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts."   R.C. 2901.01(A)(14).

{¶30} Here, while the record establishes that Davenport suffered mental health problems, which the dissent discusses at length, it does not show that Davenport was unable to understand the difference between right and wrong.   *See State v. May*, 1st Dist. Hamilton No. C-070290, 2008-Ohio-1731, ¶ 7 ("Thus, it was not enough that May had been diagnosed with a mental disease.   May had to have been unaware that it was wrong to walk into a bank, threaten the teller, and steal money.").   In fact, the dissent's conclusion that "reasonable diligence would compel counsel to make a simple and almost effortless investigation concerning a possible mental defect being present at the time that Davenport committed these acts[,]" does not establish that a NGRI would have been successful.   In addition to having a mental defect, a defendant must show that the person did not know the wrongfulness of his acts because of that mental defect.

{¶31} The record, including footage from the police officers' body cameras and a video recording of the homicide detectives' interview with Davenport after the crime, shows that Davenport knew his actions were wrong.   Footage from police officers' body cameras as well as footage from Davenport's interview with homicide detectives shows that he was calm and cooperative with officers immediately after the fire and the next morning.   While Davenport argues that this tends to show that he was insane, Davenport's responses to the officers' questions actually establish that he knew what he was doing at the time of the crime and that he knew it was wrong.   Davenport stated that the fire was "premeditated" and that he set fire to Sparks's house because Sparks "threatened [his] life with a pistol" and that he "was not going to play with anybody like that."   Davenport's decision to remain at the scene and immediately turn

himself over to the police also suggests that he knew it was wrong. Davenport also indicated that he knew setting Sparks's home on fire was wrong when he asked the homicide detective if he would receive capital punishment and stated that if he did, it would be "understandable."

**{¶32}** Further, the trial court granted Davenport's motion for an independent psychological evaluation, which Davenport's trial counsel stated was necessary to "effectively represent Mr. Davenport" and "to protect [his] constitutional rights." The motion did not limit the evaluation's scope to Davenport's competency alone. As a result, it is reasonable to conclude that Dr. Karpawich explored more than Davenport's competency and that any relevant information concerning Davenport's psychological state, including his sanity at the time of the crime, was provided to Davenport's trial counsel, who the trial court noted were "two real good attorneys" and who ultimately decided to not pursue a NGRI plea.

**{¶33}** Information included in Dr. Karpawich's report actually suggests that a NGRI plea would not have been successful. The report included numerous statements by Davenport that he was "sad and depressed," "feeling irritable, angry, and upset for a long time," and "often had thoughts of harming others as well as himself." Dr. Karpawich's report noted that Davenport voluntarily committed himself "on several occasions due to concerns about his suicidal thoughts and his fear that he may harm others." Davenport's decisions to commit himself based on his fear of harming others suggests that he knew that harming others was wrong. *See May*, 1st Dist. Hamilton No. C-070290, 2008-Ohio-1731, at ¶ 8 ("He would not have admitted to his mental-health counselor that he was depressed and was thinking about robbing a bank if he did not know that robbery was wrong.").

**{¶34}** The dissent cites to Tammy Mahone's testimony where she described Davenport as "out of his mind." At most, Mahone's testimony could arguably be evidence that Davenport

was suffering from a mental defect at the time; however, Mahone's testimony did not provide any evidence showing that Davenport did not know that burning down Sparks's house was wrong. In fact, Mahone also testified that Davenport asked Mahone's son to move his truck because he was going to burn Sparks's home down and that he planned on doing so because Sparks pulled a gun on him. That testimony shows that Davenport's actions were premeditated and that his actions were the result of a desire for revenge, not of a mental defect.

{¶35} Further, Mahone's observation that Davenport was "out of his mind" may have been the result of Davenport's drug and alcohol use that day. According to the record, Davenport "was drinking alcohol on a daily basis, smoking marijuana a few times a week, and snorting powder cocaine and pain pills" around the time that he set fire to Sparks's home. Davenport admitted to police officers that he drank heavily and had done "a ton of cocaine" prior to setting the fire. Voluntary intoxication and drug use, however, is not enough to demonstrate that Davenport failed to recognize the wrongfulness of his actions. *Gilmore*, 8th Dist. Cuyahoga No. 103479, 2016-Ohio-4697, at ¶ 10 (the defendant knew the wrongfulness of her actions even though the defendant "admitted to being a daily cocaine abuser" and "also admitted to smoke the drug K2 prior to committing the offense"). As Dr. Karpawich's report noted, despite Davenport's multiple hospitalizations for his mental health and drug abuse issues, Davenport continued to abuse drugs and alcohol, which only exacerbated his mental health issues. Dr. Karpawich also noted that Davenport was previously diagnosed with "PCP-induced mood disorder [and] mixed drug dependence (PCP, THC, alcohol)" and that Davenport previously reported that "drugs have made him feel depressed, suicidal, and aggressive at different times." Therefore, Davenport's voluntary consumption and abuse of drugs and

alcohol neither excuses his heinous crime nor supports his argument that a NGRI plea would have been successful.

{¶36} Therefore, because a NGRI plea did not have a reasonable probability of success, Davenport's trial counsel's decision to not pursue a NGRI plea was reasonable and did not constitute ineffective assistance of counsel.

{¶37} Accordingly, we overrule Davenport's assignment of error.

{¶38} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., CONCURS;
LARRY A. JONES, SR., J., DISSENTS WITH SEPARATE OPINION

LARRY A. JONES, SR., J., DISSENTING:

{¶39} Respectfully, I dissent. I would find that Davenport was deprived of his right to effective assistance of counsel and reverse his conviction.

{¶40} Attorneys for Davenport failed to pursue a NGRI defense and their failure to investigate this defense constituted ineffective assistance of counsel. Dr. Karpawich noted in his report that Davenport had a "significant history of mental health as well as substance abuse problems." In the past, Dr. Karpawich noted, Davenport had been diagnosed with major depressive disorder, mood disorder, bipolar disorder, intermittent explosive disorder, borderline personality disorder, and polysubstance abuse/dependence.

{¶41} Dr. Karpawich reported that Davenport had "had chronic suicidal thoughts and auditory hallucinations since he was a teenager." Davenport had been hospitalized five times in the 15 months prior to the instant offense and had symptoms that included "depression, suicide attempts, auditory hallucinations, irritability, impulsivity, anger, paranoia, social isolation, guilt and feelings of helplessness/hopelessness." He had attempted suicide several times and was hospitalized less than three weeks before he set fire to Sparks's house. He was admitted to the psychiatric unit for stabilization on October 17, 2015, because he was hearing auditory hallucinations telling him to hurt himself. While in the hospital, Davenport continued to have suicidal thoughts, his mood was depressed, and he felt paranoid. He was discharged one week before the instant offense.

{¶42} Dr. Karpawich opined that Davenport was competent to stand trial. The doctor, however, did not assess his sanity at the time of the act. Although the majority opines that "it is reasonable to conclude that Dr. Karpawich explored more than Davenport's competency and that any relevant information concerning Davenport's psychological state, including his sanity at the time of the crime, was provided to Davenport's trial counsel, who the trial court noted were 'two real good attorneys,'" the record does not support that conclusion. Dr. Karpawich's report is clearly a competency to stand trial evaluation requested by Davenport's first set of attorneys.

Davenport's trial attorneys, the "two real good attorneys," did not represent Davenport until after he had met with Dr. Karpawich. In fact, the report is dated August 16, 2016, which is before the date one of his trial attorneys was assigned to the case. Thus, what was reasonable to conclude is that Davenport's trial counsel decided to rely on what his first set of attorneys requested from Dr. Karpawich, which was a competency to stand trial evaluation.

{¶43} As mentioned, R.C. 2901.04(A)(14) provides that a person is "not guilty by reason of insanity" if that person proves "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." But a defendant only needs to prove NGRI by a preponderance of the evidence. *State v. Rickard*, 6th Dist. Wood Nos. WD-15-046 and WD-15-047, 2016-Ohio-3374, ¶ 18, citing *State v. Filiaggi*, 86 Ohio St.3d 230, 242, 714 N.E.2d 867 (1999). "Therefore, the burden is not necessarily high. Nevertheless, no burden can be met by unpresented evidence." *Id.*

{¶44} Witness Tammy Mahone described Davenport as "out of his mind" when he requested Mahone have her son move his truck because he wanted to burn down Sparks's house. After the fire, Davenport remained on scene and loudly pronounced that he set the fire and explained to police how he set the fire. He made no attempt to flee the scene or dispose of the items he used to set the fire.

{¶45} In this case, as a result of the disturbing testimony of each of the eyewitnesses, reasonable diligence would compel counsel to make a simple and almost effortless investigation concerning a possible mental defect being present at the time that Davenport committed these acts — especially since Davenport's original attorneys already had engaged a doctor to examine him for competency to stand trial. While the majority notes that this conclusion "does not establish that a NGRI would have been successful[,]" the concern is not whether the defense

*would* have been successful – as the majority also notes, Davenport's burden is to show a *reasonable probability* that, but for counsel's deficient performance, the result of the proceeding would have been different.

{¶46} A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Based on the record before us, I would find that Davenport's burden has been met.

{¶47} I also disagree that counsel's failure to investigate and pursue an insanity defense fell within the purview of trial strategy. Based on the evidence provided by the state during discovery, NGRI was likely to be the only defense available to Davenport. Indeed, at trial, the evidence presented left no doubt that Davenport caused the fire that killed Sparks, and defense counsel admitted as much during closing arguments. Thus, I would find that counsel's failure to investigate and pursue an NGRI defense deprived Davenport of his right to effective assistance of counsel.

{¶48} I would reverse Davenport's conviction and remand for further proceedings.