[Cite as *State v. Rachells*, 2026-Ohio-1194.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                             No. 115358

    v.                                       :

MARVIN RACHELLS,                        :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 2, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-691840-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Ben McNair, Morgan Austin, and Chloe Robinson, Assistant Prosecuting Attorneys, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Francis Cavallo, Assistant Public Defender, *for appellant*.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Marvin Rachells ("Rachells") appeals his conviction for aggravated murder. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} In May 2024, a grand jury convened and indicted Rachells for the following charges related to the death of Lisa Brownlee ("Brownlee") on May 6, 2024: aggravated murder, an unclassified felony (Count 1); two counts of murder pursuant to R.C. 2903.02(A) and (B), unclassified felonies (Counts 2 and 3); and two counts of felonious assault pursuant to R.C. 2903.11(A)(1) and (2), felonies of the second degree (Counts 4 and 5). Each count included one- and three-year firearm specifications and forfeiture specifications for a weapon, cash, and a vehicle associated with the crime.

{¶ 3} A jury trial commenced in June 2025. On the third day of trial, while jury selection was still under way, the defense informed the court that the State turned over additional discovery that it believed would have been helpful to its case if provided earlier. The defense acknowledged that it received "three or four disbursements of discovery" in the form of raw data from Rachells' cell-phone provider. A few days before trial, the defense received the State's exhibit that mapped this data. After that, it subsequently received a second exhibit based on additional raw data that the State had not provided in discovery. This additional information, when mapped, put Rachells' cell phone within the vicinity of the homicide.

{¶ 4} The defense objected to the State's exhibit and argued that it would be fundamentally unfair for the State to "blindside" them with this information "literally on the eve of trial" and to get the final interpretation of the data after trial

commenced. Furthermore, if the defense had this information, it could have obtained an expert to review and challenge the evidence. As a result, the defense moved to exclude the State's cell-mapping exhibit from trial.

{¶ 5} The State acknowledged that they provided the evidence late because of an oversight. Cleveland Police Detective Tim Cramer ("Det. Cramer") had received the raw data pursuant to a subpoena but had not turned it over to the prosecutor. The oversight was discovered during trial preparation. Nevertheless, the State argued that the exhibit in question was merely a visualization of the cell phone data and that it was not an expert report and should be admitted. The State acknowledged that there was a discovery violation but argued that exclusion of the evidence was an extraordinary remedy and should not be utilized. Finally, the State argued that the evidence was not "game-changing" and that there was other evidence that placed Rachells at the scene of the homicide.

{¶ 6} In response, the defense countered that if the evidence was not "game-changing" then exclusion was a proper remedy. Moreover, they argued that neither the State nor Det. Cramer acted in bad faith, but that their oversight had compromised the integrity of the case. The defense did not request a continuance or suggest another remedy short of exclusion of the evidence. Ultimately, the trial court overruled the defense's objection and the trial continued.

{¶ 7} The following testimony was developed at trial. Cleveland Police Officer Patrick Wells ("Officer Wells") and his partner were first on scene responding to a report that a woman had been shot in the head in a park on Superior

Avenue. On arrival, he observed a female "sprawled" under a concrete park bench. There was a substantial amount of blood on and under the bench. Officer Wells was unable to detect a pulse. A bystander informed him of Brownlee's name and approximate age. The bystander also stated that someone walked up and shot Brownlee, but she was unwilling to give any other information out in the open, near other people.

{¶ 8} Cleveland Police Detective Thomas Connole ("Det. Connole") was one of several officers who processed evidence in this case. At the crime scene, he observed, marked, and collected two 9 mm shell casings that were found on top of a table near where Brownlee's body was found. After the pathologist from the Cuyahoga County Medical Examiner's Office arrived and moved the body, Det. Connole discovered a spent bullet inside the victim's clothing.

{¶ 9} Cleveland Police Officer Michael Deighan ("Officer Deighan") testified that he was called by undercover officers to assist in a traffic stop of a homicide suspect's vehicle the day after the homicide. Officer Deighan and his partner, Officer Lewis Stevens ("Officer Stevens"), initiated the traffic stop on a red Cadillac Escalade. Officer Deighan identified the driver as Rachells. Rachells was arrested as a result, and the officers secured two firearms that Rachells was carrying on his person. Rachells cooperated during his arrest, though he initially did not respond to the first request to exit the vehicle.

{¶ 10} Officers subsequently searched Rachells' residence pursuant to a search warrant. There, Det. Connole secured a cell phone, a box of 9 mm

ammunition, and two safes. He also secured the following clothing items at the direction of homicide detectives: a black hooded jacket, a camouflage baseball cap, two pairs of camouflage pants, and a pair of black tennis shoes. Additionally, he confiscated a store receipt and took a picture of a red bag of crinkle-cut french fries.

{¶ 11} Cleveland Police Detective Thomas Manson ("Det. Manson") processed the safes removed from Rachells' apartment after detectives obtained a separate search warrant for them. Det. Cramer later testified that he secured a key to the smaller of the two safes and inside that safe he found the combination to the larger safe. Det. Manson used that combination to open the larger safe in which he found two firearms, including a Glock 19 9 mm handgun. The firearm was loaded and had a seated magazine, with a live round in the chamber. Det. Manson collected DNA swabs from the firearm.

{¶ 12} Cleveland Police Homicide Detective Andrew Hayduk ("Det. Hayduk") testified that he collected surveillance video from a nearby store, which captured the homicide. The State showed the original video and a video that zoomed in on the area where the homicide occurred to the jury. The videos showed Brownlee seated with her back to the approaching shooter, talking to someone seated across from her. It did not appear from the videos that the shooter spoke to either Brownlee or her companion. The shooter appeared to walk up to Brownlee's right side, raise his arm, and shoot Brownlee in the head and torso as she fell from her seat.

{¶ 13} Cleveland Police Detective Eric Strick processed two cars registered to Rachells, a four-door GMC Terrain (the "GMC") and a 2021 red four-door Cadillac Escalade. He collected DNA samples from the vehicles.

{¶ 14} Cuyahoga County Regional Forensics Laboratory Forensic Scientist Lisa Przepyszny ("Przepyszny") analyzed trace evidence collected in the case. She tested Brownlee's sweatshirt and found an entrance wound in its back with an exit in its front. She also found an additional bullet fragment in the victim's clothing. Przepyszny determined that the distance from the muzzle of the gun to Brownlee's sweatshirt was intermediate, which she described as anywhere from a distance of one foot to four or five feet. She also received clothing from Rachells' apartment; however, she did not find any blood on the clothes.

{¶ 15} Cuyahoga County Regional Forensics Laboratory DNA Analyst Marissa Esterline ("Esterline") examined several DNA swabs submitted by Cleveland police. Some of the DNA swabs were obtained from a GMC Terrain registered to the defendant that was identified as the suspect vehicle. She was able to determine that DNA lifted from the gearshift and/or steering wheel of the GMC came from Rachells. Additionally, Esterline determined that DNA taken from the Glock-19 firearm removed from Rachells' safe was a mixture of two people's DNA and that 95 percent of the sample came from Rachells. There was not enough DNA in the remaining sample to determine its origin.

{¶ 16} Cuyahoga County Medical Examiner's Office Investigator Jim Kooser testified as a ballistics expert. He compared the two spent shell casings from the

park and two bullets that were recovered from Brownlee's clothing with the Glock-19 firearm recovered from Rachells' safe. He determined that all of the bullets were fired from the Glock-19 firearm.

{¶ 17} Cuyahoga County Medical Examiner's Office Chief Deputy Medical Examiner and Forensic Pathologist Doctor Joseph Felo ("Dr. Felo") conducted the autopsy on Brownlee's body. He determined that there were two gunshot wounds. One bullet entered just above Brownlee's right cheek bone and exited out of the right side of her neck, passing through the left carotid artery, a fatal wound. He also determined that, because of the presence of unburnt gunpowder on the surface of the skin, the muzzle-to-target distance for this gunshot was close range, between 12 and 18 inches. The second bullet entered her left upper abdomen, passed through Brownlee's back, and exited through the front of her upper abdomen. Because of her clothing, Dr. Felo did not opine about the muzzle-to-target distance of this gunshot. Dr. Felo further noted that he could not tell which shot occurred first, but based on his examination, he opined the shots occurred in close proximity to one another.

{¶ 18} Cuyahoga County Prosecutor's Office Crime Analyst Reem Almukdad ("Almukdad") testified regarding cell-phone mapping based on records the State received from Rachells' cell-phone carrier. After inputting the data into a program, she determined that Rachells' cell phone was in the vicinity of the crime scene, a Save-A-Lot convenience store on Superior, a Walmart at Steelyard Commons, and near his residence during the times surrounding the homicide.

{¶ 19} Det. Cramer was in charge of the overall management of the case. In addition, he collected video footage from several stores within the vicinity of the homicide. He testified that he also reviewed footage from Flock cameras, cameras that read license plates throughout Cuyahoga County. The State presented a demonstrative video that combined the footage from surveillance cameras, Flock cameras, store videos, and cell phone data.

{¶ 20} Det. Cramer summarized the demonstrative video as it was played for the jury. He testified that the video showed the GMC registered to Rachells enter and park in a parking lot near a Forman Mills Store, which is in close proximity to the scene of the homicide. The video showed the driver leave the car, exit the parking lot, and walk through the streets towards the park. Another video captured the suspect walking. He appeared to be wearing a dark hoodie, light pants, a dark cap with a light front panel, and black shoes. The video then showed the same person walk into the park, approach Brownlee, and shoot her twice. The shooter was then seen jogging back the way he came, returning to the Forman Mills parking lot, and entering the GMC.

{¶ 21} Afterward, video depicts the GMC exiting the parking lot and driving through the city to a nearby Save-A-Lot convenience store. Cameras inside the store captured the suspect walking through the aisles. He can be seen picking up and carrying a large red bag of crinkle-cut french fries. Det. Cramer was able to obtain a store copy of the receipt for the purchase, which showed the items were paid for with an Electronic Benefit Transfer ("EBT") card belonging to Rachells. The EBT card

was on Rachells' person when he was arrested. As mentioned earlier, Det. Connole recovered the original receipt during the search of Rachells' residence and found, and took a picture of, a red bag of crinkle-cut french fries in the apartment. Various cameras and cell mapping data tracked the GMC to Walmart. In-store cameras show a clearer image of the suspect. At that point, he can be seen wearing a black hoodie, camouflage pants, and black shoes. Det. Cramer was unable to obtain a receipt from that transaction. After the suspect left Walmart, cell phone mapping tracked the car to the vicinity of Rachells' home address.

{¶ 22} During his arrest, police recovered a police report card on Rachells' person. The card is often given to someone when they file a police report and includes the report number. Det. Cramer looked up the report number and found that Rachells had reported a Glock 19 firearm, with the same serial number as the one found in his safe, stolen in 2023. Furthermore, he found that Rachells never reported to police that he recovered the gun.

{¶ 23} Det. Cramer also interviewed Rachells. When shown a picture of the GMC, Rachells identified the car as his. Further, he identified himself in images taken of the suspect while shopping at Save-A-Lot. After obtaining a search warrant to collect DNA, Det. Cramer went to the jail to obtain a sample from Rachells. At that time, he saw a piece of paper in Rachells's hand that said, "I need Maurice to go to my place, get my safe, the police are investigating me. They are charging me with murder and have given me a . . . ." Det. Cramer took a picture of the note and collected it for evidence.

{¶ 24} After deliberations, the jury found Rachells guilty of all charges.  At sentencing, the trial court found that all the counts merged and noted that the State elected to proceed on the aggravated-murder charge.  The trial court sentenced Rachells to three years on each of two firearm specifications to run consecutively to one another and consecutively to a term of life in prison without parole on the underlying aggravated-murder charge.

{¶ 25} Rachells appeals and raises the following assignments of error for our review.

### Assignment of Error No. 1

There was insufficient evidence produced at trial to support a finding of guilt on all counts.

### Assignment of Error No. 2

The jury lost their way by finding [Rachells] guilty against the manifest weight of the evidence.

### Assignment of Error No. 3

The trial court erred by permitting evidence to be introduced over defense objection that had not been properly disclosed under Crim.R. 16, prejudicing [Rachells] and tainting the result of the trial.

### Assignment of Error No. 4

Rachells was deprived of his right to the effective assistance of counsel, under the Sixth Amendment when his attorneys failed to seek a continuance to fully [vet] late-disclosed evidence, prejudicing his defense.

## Law and Analysis

{¶ 26} For ease of analysis, we will address Rachells' assignments of error in combination when necessary.  Therefore, we begin with Rachells' first and second

assignments of error where he challenges his convictions based on the sufficiency and manifest weight of the evidence. Specifically, Rachells challenges whether the evidence established his identity as the perpetrator of the crimes.

{¶ 27} A sufficiency challenge requires a court to determine whether the State has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

{¶ 28} In contrast, "'weight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 2021-Ohio-856, ¶ 32 (8th Dist.), quoting *Thompkins* at 387. Weight of the evidence relates to "'the evidence's effect of inducing belief.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386-387. The reviewing court must consider all of the evidence in the record, the reasonable inferences to make from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.*, citing *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 29} In both assignments of error, Rachells argues that the video evidence and cell mapping data was insufficient to establish that he was the person who committed these crimes. He argues that the connection was made solely based on circumstantial evidence and that, in this case, circumstantial evidence was not enough to convict him of these crimes.

{¶ 30} However, circumstantial and direct evidence hold the same weight and any differences between the two are irrelevant to the probative value of evidence. *State v. Rodano*, 2017-Ohio-1034, ¶ 36 (8th Dist.), citing *Jenks* at paragraph one of the syllabus and *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.), citing *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001). In fact, "'[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 2011-Ohio-6078, ¶ 9 (8th Dist.), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

{¶ 31} In reaching his conclusion that his convictions were not supported by the sufficiency or the greater weight of the evidence, Rachells does not mention or challenge the evidence that directly links him to the crime. Flock cameras captured the license plate of the perpetrator's car, which was registered to Rachells. Det. Cramer used the video evidence to track the car's movements throughout the city. Furthermore, Rachells identified his car and identified himself in a still picture captured of the perpetrator while at the Save-A-Lot convenience store. Similar clothes to the ones the suspect was wearing were recovered at Rachells' residence.

Moreover, police found the murder weapon locked in a safe in Rachells' residence. Finally, Rachells reported that weapon stolen the year before the incident and possessed a card with the police report number on his person when he was arrested. Rachells never reported that the weapon had been recovered. The police report established that he not only owned the firearm but sought to hide the fact that he still had it in his possession.

{¶ 32} Based on the foregoing, the record reflects that there was sufficient evidence to support Rachells' conviction. Additionally, the jury did not lose its way, nor was this one of those extraordinary circumstances where reversal is necessary to correct a manifest miscarriage of justice. The verdicts were supported by the greater weight of the evidence. Rachells' first and second assignments of error are overruled.

**Discovery Violation**

{¶ 33} In the third assignment of error, Rachells argues that the trial court erred when it allowed the State to introduce demonstrative evidence that was created from cell-phone records that were not turned over to the defense "on the eve of trial." Rachells argues that there was a clear discovery violation that warranted a sanction and the trial court erred when it merely allowed the introduction of the evidence. Further, Rachells argues that the introduction of that evidence prejudiced him because it placed him at the scene of the homicide. Rachells' arguments are not well taken.

{¶ 34} We review a trial court's decision regarding a discovery violation for an abuse of discretion. *State v. Collins*, 2020-Ohio-4136, ¶ 18 (8th Dist.), citing *State v. Smiler*, 2014-Ohio-1628, ¶ 13 (8th Dist.), citing *State v. Wiles*, 59 Ohio St.3d 71, 78 (1991). A trial court abuses its discretion when its decision "is unreasonable, arbitrary, or unconscionable." *State v. Hill,* 2022-Ohio-4544, ¶ 9.

{¶ 35} When the trial court learns during the course of proceedings that a party failed to comply with the rules of discovery as provided for in Crim.R. 16, the court has discretion to order the violating party to permit the discovery or inspection of the evidence, grant a continuance, prohibit the party from introducing the evidence in question, or any other order that the court deems necessary under the circumstances. Crim.R. 16(L)(1).

{¶ 36} A three-factor test governs the trial court's determination of sanctions for a discovery violation committed by the prosecution. *State v. Darmond*, 2013-Ohio-966, ¶ 35. These factors are (1) whether the State willfully failed to disclose the evidence in violation of Crim.R. 16, (2) "whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Id.*, citing *State v. Parson*, 6 Ohio St.3d 442 (1983), syllabus.

{¶ 37} At trial, the defense noted that the State provided it with most of the cell-phone records as raw data. It is unclear from the record when the defense received this discovery; however, it received an exhibit mapping the data approximately a week prior to trial. After jury selection commenced, the defense

notified the court it had received the remaining data and an exhibit mapping the data, which established that Rachells' cell phone was in the vicinity of the homicide when it occurred. The State acknowledged that it had failed to provide some of the raw data in violation of Crim.R. 16 but argued it was inadvertent. The State explained that Det. Cramer had received the data but had inadvertently failed to provide it to the State, an omission that was discovered during trial preparation. The defense acknowledged in its response that there was no bad faith on the part of the State or Det. Cramer. Nevertheless, the defense argued that the late disclosure prejudiced it because of the timing and because, had it been aware of the conclusions, it could have obtained their own expert opinion.

{¶ 38} Here, Rachells again does not claim that the State's discovery violation was willful. Further, he does not directly argue that Det. Cramer's actions were willful. Instead, he argues that the failure of the police to provide the evidence to the State, even though not deliberate, must be attributable to the State. Nevertheless, while the State bears the responsibility to provide discovery, the record does not establish that the State willfully withheld the information.

{¶ 39} Next, we consider whether foreknowledge of the data would have benefited Rachells in preparation for the defense. Rachells does not explain how foreknowledge would have benefited his defense. Instead, he argues generally that, "[t]o be caught unaware of the existence of certain evidence[,] leaves the defense unarmed." The defense at trial argued that had it been aware that mapping the data would put Rachells' cell phone near the crime, it would have hired an expert,

presumably to review the data. It is not evident from the record that challenging the cell phone data was a key part of the defense's case. Rather than having an expert evaluate the data it had received, the defense elected to wait until the State provided its trial exhibits. It was not until the defense learned that data was missing and received a second exhibit that the defense raised an objection. Had the defense intended to challenge the accuracy of the cell phone data, it would have done so prior to trial. Until advised otherwise, the defense believed it had received all the cell phone records and could have sought expert analysis, if that was its intention. Accordingly, Rachells has failed to establish how foreknowledge would have benefitted his case.

{¶ 40} Finally, we consider whether the evidence prejudiced Rachells' defense. Rachells argues that the failure to receive the evidence hampered his ability to investigate or reasonably challenge the accuracy of the evidence for trial. Again, the accuracy of the cell phone data was not a key defense strategy at trial. Even if it was, there was ample evidence that linked Rachells to the crime. The evidence established that Rachells' car was observed near the crime scene, video evidence tracked someone dressed in clothes similar to clothes found in Rachells' apartment walking to the crime scene and shooting the victim, Rachells' DNA was found in the GMC used by the shooter, and the murder weapon was found in Rachells' locked safe. There was overwhelming evidence linking Rachells to this crime, such that he was not prejudiced by the introduction of the cell phone mapping data.

{¶ 41} Accordingly, the third assignment of error is overruled.

**Ineffective Assistance of Counsel**

{¶ 42} In the fourth assignment of error, Rachells argues that he received ineffective assistance of counsel since his lawyers failed to ask for a continuance when they learned about the State's discovery violation. We disagree.

{¶ 43} In order to establish a claim of ineffective assistance of counsel, an appellant must demonstrate (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Therefore, "'the failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel.'" *State v. Harris,* 2021-Ohio-856, ¶ 21, citing *In re S.A.*, 2019-Ohio-4782, at ¶ 46, quoting *State v. Davenport*, 2018-Ohio-2933, ¶ 25, citing *Strickland* at 697.

{¶ 44} Without addressing the performance of Rachells' trial counsel, his argument fails because he has not established that he was prejudiced, i.e., that but for counsel's errors, the result of the trial would have been different. Rachells has failed to point to any evidence in the record to suggest that if his counsel had asked for a continuance, the results of the trial would have been different. At most, a continuance would have allowed the defense to secure the testimony of a witness who could presumably contradict the evidence of the State's analyst regarding the location of the cell phone. The possible results of such an action are merely speculative. Given the other evidence tying Rachells to the crime, there is no

evidence that this disputed testimony, if presented, would have yielded a different result.

{¶ 45} Accordingly, the fourth assignment of error is overruled.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

EILEEN T. GALLAGHER, P.J., and
DEENA R. CALABRESE, J., CONCUR