[Cite as *State v. Newell*, 2019-Ohio-976.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 106584 |
| KIECHAUN NEWELL, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:**  March 21, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-16-609565-A

***Appearances:***

Eric M. Levy and Jaye M. Schlachet, *for appellant.*

Michael C. O'Malley, Prosecuting Attorney, and Brian D. Kraft and Maxwell Martin, Assistant Prosecuting Attorneys, *for appellee.*

LARRY A. JONES, SR., J.:

{¶ 1} Defendant-appellant Kiechaun Newell ("Newell") appeals his multiple convictions, rendered after a jury trial. Finding no merit to the appeal, we affirm.

{¶ 2} In 2016, Newell was charged with two counts of aggravated murder, one count of murder, two counts of kidnapping, two counts of felonious assault, one count of discharge of a firearm on prohibited premises, one count of tampering with evidence, one count each of robbery and theft, and two counts of having weapons while under disability. The counts included numerous firearm and gang activity specifications. The case proceeded to a jury trial, at which the following pertinent evidence was presented.

{¶ 3} In August 2016, Newell and fellow gang member, Jeffrey Doss ("Doss"), decided to rob a Citizens Bank branch in Northfield, south of Cleveland. They enlisted the help of B.F., who was 17 years old. Doss staked out the inside of the bank. B.F. entered 10-15 minutes later and handed a teller a demand note. B.F. took around $2,000 from the bank, but most of the money was destroyed after a dye pack exploded in the money bag. After the robbery, Doss and B.F.'s pictures were shown on local media. Doss was concerned that B.F. would turn them in, so he told Newell to kill B.F.

{¶ 4} On August 19, 2016, Newell and three 15 year-old males picked B.F. up at her house. At some point, Newell, who was in the backseat with B.F., told the driver to stop the car near an abandoned lot in East Cleveland. When B.F. got out of the car to change seats, Newell shot her. The group left B.F. and started to drive away but Newell realized B.F. was still alive. Newell instructed the driver to back up, and he shot B.F. again, killing her.

{¶ 5} During the course of the initial investigation into B.F.'s death, the East Cleveland Police Department developed a suspect, Jasean Woods ("Woods"). They arrested Woods and searched his house pursuant to a warrant. The police recovered a black .380 caliber Ruger firearm, which matched the suspected type of gun used to kill B.F. The recovered firearm belonged to B.F.'s mother; Woods had stolen it from her. The police discovered that the firearm did not match the casings found on the scene of B.F.'s death and ruled out the gun as the murder weapon. Woods was eventually released and was not charged in connection with this case.

**Trial Testimony**

### Tiffany Newell

{¶ 6} Tiffany Newell ("Tiffany"), Newell's mother, heard about a bank robbery involving her son. Newell admitted to his mom that he was involved in the bank robbery. He told his mother he had to kill B.F. so she would not "snitch" on him. The day after the shooting, Tiffany overheard Newell talking with his sister, Kieauntee Newell ("Kieauntee"). Newell asked Kieauntee if she had heard about a shooting on First Avenue, and Tiffany knew he was talking about B.F. because of their prior conversation. Tiffany heard Newell tell his sister to look it up online; when she did, Newell said, "I did that."

{¶ 7} Later that night, Tiffany was playing cards with her children. Tiffany asked Newell about the murder and he admitted he shot B.F. Newell told his mom and sister that he and three friends went to the Longwood projects to pick up B.F. B.F. got in the back seat with Newell and they drove to First Avenue, where they

stopped and he pretended they were going to switch seats. B.F. got out of the car. Newell, who was on the passenger side of the car, shot B.F. in the back. B.F. spun around and said, "Oh, oh, somebody shot me," and fell to the ground. Newell got in the car and left, but saw B.F. getting back up, so the driver backed up and Newell got out and shot her again.

{¶ 8} According to Tiffany, after she had this conversation with her son, they all went to bed but Tiffany could not fall asleep. Early the next morning, Tiffany unsuccessfully tried to contact the FBI. She ended up leaving a voicemail and was later contacted by a East Cleveland detective.

**Kieauntee Newell**

{¶ 9} Kieauntee testified that Newell told her that he thought that B.F. was going to tell on him about the bank robbery and so he wanted to kill B.F. On the morning of August 20, 2016, Newell asked Kieauntee if she saw the news about the girl that was murdered on First Avenue. Newel told his sister, "I did that." According to Kieauntee, Newell's demeanor was "[n]onchalant like he did not care."

{¶ 10} Later that night, they were playing cards with their mother and Newell told them about the murder in more detail. Newell said that he and three boys picked up B.F. at her house in a stolen car. Newell said they were driving around East Cleveland and he told them to stop on First Avenue. Newell told B.F. to get out of the car and he shot her. B.F. turned around and said something to Newell, and he shot her again. As the group drove away, Newell saw B.F. was still moving, so they backed up and he got out and shot her two more times.

{¶ 11} Kieauntee testified that she initially did not want to talk to the police because Newell was her brother. Her mother persuaded her, however, by telling her that because she (Tiffany) has daughters, she would want someone to do the same thing so she could get justice. Kieauntee decided she felt the same way. Kieauntee met with East Cleveland Detective Kenneth Lundy ("Detective Lundy") and testified that she felt like she had to tell the truth because she was pregnant with a girl.

**Juvenile eyewitnesses**

{¶ 12} G.J., J.B., and T.G. were the three juveniles that were with Newell when he killed B.F. They were charged in juvenile court in connection with the shooting. Each juvenile entered into a plea agreement with the state. As part of their individual plea agreements, each juvenile agreed to testify truthfully against Newell. G.J. and J.B. were adjudicated delinquent of involuntary manslaughter with a three-year firearm specification. T.G. was adjudicated delinquent of involuntary manslaughter with a one-year firearm specification.

{¶ 13} The three juveniles testified to similar facts about the shooting. 15-year-old J.B. knew Newell through a friend. J.B. was part of two local gangs, the Black Disciples and the Gangster Disciples. According to J.B., Newell was part of the Black Disciples and had a leadership position in the gang. Doss also had a leadership position and was "higher up" than Newell. J.B. testified that G.J. and T.G. were not gang members, but he thought they wanted to join a gang.

{¶ 14} On August 19, 2016, J.B. stole a Jeep. He picked Newell up at a bus stop, thinking that they were going to drive around and look for people to rob.

Newell told J.B. they needed to go pick up a girl because he had something to take care of, which J.B. took to mean that Newell was going to get "rid of her" by killing her. Newell showed J.B. his gun.

{¶ 15} They went to pick up G.J. G.J. testified that the first time he met Newell was on that night. J.B. asked G.J. and his cousin, T.G., if they wanted to go with him to drop off Newell. T.G. testified that he and G.J. went along for the chance to drive the stolen Jeep.

{¶ 16} Newell asked G.J. to retrieve latex gloves from his house; G.J. assumed Newell wanted gloves because they were in a stolen car. When they left G.J.'s house, J.B. was driving, G.J. was in the passenger's seat, and T.G. and Newell were in the back seat. T.G. was seated in the backseat on the driver's side and testified he was wearing latex gloves; according to J.B., they all donned the gloves.

{¶ 17} They got gas and pulled over to switch seats so G.J. could drive. Newell told them to drive to Longwood Estates to pick up B.F. After B.F. got in the car, J.B. drove and G.J. sat in the front passenger seat. Newell, B.F., and T.G. were in the backseat. Newell began "kissing and feeling on B.F." and told B.F. he loved her. Newell directed J.B. to drive to East Cleveland.

{¶ 18} T.G. thought they were driving to East Cleveland to drop off Newell and B.F. Eventually, Newell instructed J.B. to pull over so they could again switch seats. Everyone except T.G. got out of the Jeep. According to T.G., Newell pushed B.F. and she said "Oh, what you doing?" Newell then shot B.F. According to G.J., Newell was wearing latex gloves. J.B. testified he heard a total of five shots.

{¶ 19} The group left B.F. on the ground and started to drive away, but heard B.F. screaming. Newell said, "Hold on, stop the car, this b*** ain't dead." Newell got out of the car and shot B.F. again, killing her. Newell got back in the car and said, "Why you all so quiet?"

**Detective Lundy**

{¶ 20} Detective Lundy from the East Cleveland Police Department responded to the scene. He described the area as very dark, open, with no nearby houses or street lights. When he arrived on scene, B.F., was deceased.

{¶ 21} On August 28, 2016, Detective Lundy received information from the FBI that Tiffany had information about the murder. He met with Tiffany and Kieauntee. Both women identified Newell as the person responsible for B.F.'s murder. Newell was arrested.

{¶ 22} Over the course of the next three to four days, Detective Lundy interviewed Newell several times. At first, Newell told the detective that he was trying to save B.F. from the other males in the car, who were going to rape her. Then he told the detective that he shot B.F. under orders from Doss, but Doss fired the shots that killed B.F.

{¶ 23} During one of the interviews, Tiffany was in the room encouraging her son to tell the truth. During another interview, Detective Lundy placed in the interview room a "prop" that appeared to be a DVD labeled "Statement of Jeffrey Doss." Eventually, Newell told Detective Lundy that Doss was worried that B.F.

would tell someone about the bank robbery, so Doss, who was higher ranking in the gang than Newell, told Newell to "take care of business."

{¶ 24} Newell eventually admitted that, on the day of the murder, Newell had J.B. pick him up at a bus stop. They met up with G.J. and T.G. They drove to Longwood Estates to pick up B.F. and then drove to East Cleveland. B.F. got out of the car and Newell shot her several times. Newell got back in the car but realized B.F. was still alive, so he shot her two more times, using a black .380 caliber gun. Newell said he shot B.F. a total of five times.

{¶ 25} The next day, September 1, 2016, Newell tried to recant his previous statement and told the detective that he did not shoot B.F.

### BCI scientists

{¶ 26} Three forensic scientists from the Ohio Bureau of Criminal Investigation ("BCI") testified at trial. BCI scientist Brenda Butler responded to the scene on First Avenue. She testified that she observed footprints in the area of B.F.'s body that appeared to have been made by an athletic shoe. She collected an impression from one of the shoeprints. She also recovered five bullet casings and took an impression of the tire treads left at the scene.

{¶ 27} BCI forensic scientist Daniel Davison compared Newell's size 12 Nike athletic shoes to the print recovered from the scene. He opined that Newell's shoe could have made the impression but that another shoe with the same characteristics could have also made the impression.

{¶ 28} Brittani Farinacci ("Farinacci") testified that she received a gun, a gray T-shirt, a pair of shoes, and Newell's DNA standard. Her job was to see if there were any items that she could swab for DNA testing but the actual testing would be completed by another BCI analyst. Farinacci did not observe any blood on the T-shirt or the shoes so she did not forward them for further DNA testing. She sent Newell's DNA standard back to the East Cleveland Police Department because she does not conduct the DNA testing and had no need for the standard.

{¶ 29} Lindsay Nelsen-Rausch ("Nelsen-Rausch") testified that she swabbed the firearm that was recovered during a search warrant related to Woods and found a mixture of DNA, which indicated that there was DNA present from more than one person. Nelsen-Rausch received standards of Woods and two other men (not Newell) but was unable to find a DNA match. Nelsen-Rausch never received Newell's DNA standard.

**Coroner's testimony**

{¶ 30} Dr. Erica Armstrong completed the autopsy on B.F. The cause of death was multiple (five) gunshot wounds to B.F.'s trunk and extremities and her death was classified as a homicide.

**Polygraph test**

{¶ 31} During trial, the parties discovered that Newell had taken a polygraph exam while in police custody. Neither Newell's attorney nor the prosecutor previously knew about this test. The state contacted the polygrapher and learned that Newell was asked two questions: "Did you shoot [B.F.]?" and "On August 19th,

did you shoot [B.F.]?" Newell responded "No" to both questions, and was found to be deceptive on both. The state requested the polygrapher's report and shared it with defense counsel. Defense counsel subsequently moved for a mistrial, which the trial court denied.

**Conviction and sentence**

{¶ 32} The jury convicted Newell as follows: Counts 1 and 2, aggravated murder with one- and three-year firearm and criminal gang activity specifications; Count 3, murder with one- and three-year firearm and criminal gang activity specifications; Count 4, kidnapping with one- and three-year firearm and criminal gang activity specifications; Counts 5 and 6, two counts of felonious assault with one- and three-year firearm and criminal gang activity specifications; Count 7, discharge of a firearm on or near prohibited premises with one- and three-year firearm specifications; Count 8, tampering with evidence with a one-year firearm specification; and Count 9, aggravated theft with a one-year firearm specification. The court convicted Newell of Count 14, having weapons while under disability.[1]

{¶ 33} The trial court sentenced Newell as follows: Count 1, life in prison with the possibility of parole after 30 years plus 6 additional years on the specifications; Count 4, 10 years plus an additional 3 years for the firearm specification, to run prior to and consecutive to Count 1; Count 14, 1 year to run concurrent to the other counts. The court merged Counts 2, 3, 5, 6, and 8 with

---

[1]The state dismissed one kidnapping charge and one having weapons while under disability charge. The court dismissed the robbery count pursuant to Crim.R. 29.

Count 1.  Thus, Newell's aggregate sentence is life in prison with the possibility of parole after 49 years.

{¶ 34} Newell filed this appeal.  Further facts will be set forth under the appropriate assignments of error.  Some assignments of error are combined for review.

## Assignments of Error

I.  Appellant was denied his right to due process of law where the trial court failed to dismiss his trial where the state failed to preserve or disclose evidence.

II.  The trial court erred and abused its discretion when it failed to conduct a hearing, balance the required facts, and impose any sanction against the state of Ohio for its discovery violations.

III.  The trial court erred and abused its discretion when it denied appellant's request for a mistrial or otherwise failed to impose a less severe discovery sanction upon the state of Ohio for its failure to disclose that appellant was subject to a custodial polygraph test and turn over statements made as part thereof; failure to disclose that appellant was taken from the East Cleveland jail to the crime scene prior to obtaining a confession; and failure to disclose that it had obtained appellant's DNA and failed to analyze it as a part of its investigation.

IV. The trial court erred by imposing consecutive sentences which are not supported by the record.

V. Appellant's convictions were not supported by sufficient evidence.

VI. Appellant's convictions were against the manifest weight of the evidence.

VII. Appellant received ineffective assistance of trial counsel in violation of the Fifth and Sixth Amendments to the United States Constitution.

VIII. The cumulative effect of errors deprived appellant of a fair trial.

**Alleged discovery violations did not warrant mistrial**

{¶ 35} In the first, second, and third assignments of error, Newell contends that the state committed numerous discovery violations and the trial court erred in failing to sanction the state or in declaring a mistrial.

*Brady* **Violation**

{¶ 36} In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that a criminal defendant may claim denial of due process when the prosecution fails to disclose the existence of exculpatory evidence. Exculpatory evidence is defined as evidence favorable to the accused, which "if disclosed and used effectively, * * * may make the difference between conviction and acquittal." *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 70, citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

{¶ 37} To establish a violation under *Brady*, the appellant must prove three elements: (1) the prosecution failed to disclose the evidence upon request; (2) the evidence was favorable to the defense; and (3) the evidence was material. *Moore v. Illinois*, 408 U.S. 786, 794-795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Evidence is material if there is a reasonable probability that the result of the proceeding would have been different if the prosecution had disclosed the evidence to the defense. *Braun* at ¶ 66. When an appellate court reviews an alleged *Brady* violation, it is the appellant's burden to prove that there was a violation and that it rose to the level of

denial of due process.  *Braun* at ¶ 68, citing *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991).

{¶ 38} In *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court determined that the *Brady* rule applies only in situations involving the discovery of information *after trial* that was known to the prosecution but not known to the defense.  Accordingly, in *State v. Wickline*, 50 Ohio St.3d 114, 552 N.E.2d 913 (1990), the Ohio Supreme Court found that no *Brady* violation occurred where the state presented the alleged exculpatory records during trial.

**Crim.R. 16**

{¶ 39} As is relevant to this case, Crim.R. 16(B) provides that the prosecuting attorney shall provide to the defense, upon request:

> (1)  Any written or recorded statement by the defendant or a co-defendant, including police summaries of such statements, and including grand jury testimony by either the defendant or co-defendant;
>
> (3)  Subject to divisions (D)(4) and (E) of this rule, all laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings, or places;
>
> (6)  All reports from peace officers, the Ohio State Highway Patrol, and federal law enforcement agents, provided however, that a document prepared by a person other than the witness testifying will not be considered to be the witness's prior statement for purposes of the cross examination of that particular witness under the Rules of Evidence unless explicitly adopted by the witness;
>
> * * *.

{¶ 40} In order to prove that there was a discovery violation that amounted to a due process violation, an appellant must show that the evidence was material to a finding of guilt, and the appellant bears the burden of proving its materiality. *State v. Thomas*, 8th Dist. Cuyahoga No. 87666, 2006-Ohio-6588, ¶ 18-19. Evidence is only material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus.

{¶ 41} If a trial court finds that there was a discovery violation, it must impose the least restrictive sanction to cure the violation. *State v. Darmond*, 135 Ohio St.3d 343, 986 N.E.2d 971, 2013-Ohio-966, ¶ 20-22; *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 2, 511 N.E.2d 1138 (1987). The appellate court reviews a trial court's decision whether to sanction under an abuse of discretion standard. *Darmond* at ¶ 33. A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary. *Id.* at ¶ 34; *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980); *see also State v. Miller*, 8th Dist. Cuyahoga No. 100461, 2014-Ohio-3907, ¶ 67.

{¶ 42} If a reviewing court finds a discovery violation was not properly cured by the trial court, the reviewing court will consider whether any resulting error was harmless. *Middleburg Hts. v. Lasker*, 8th Dist. Cuyahoga No. 103903, 2016-Ohio-5522, ¶ 16 (holding that an undisclosed witness's testimony was harmless error because it was cumulative to other witness testimony).

{¶ 43} It is with these concepts in mind that we review each alleged discovery violation.

**a. Polygraph report**

{¶ 44} During trial, the parties became aware that Newell underwent a polygraph test while he was in police custody. Newell claims that the information gleaned from the polygraph test was "potentially useful" to him because it may have provided a reason why Newell confessed to B.F.'s murder or provided other background information regarding the investigation and potential police misconduct. Newell further contends that the police's failure to disclose the polygraph report was done in bad faith.

{¶ 45} The criteria for the admission of polygraph examination results was set forth in *State v. Souel*, 53 Ohio St.2d 123, 372 N.E.2d 1318 (1978). One criterion is that all parties must stipulate to the admission of the test results:

> The nature of polygraphs is different from traditional scientific tests. Most, if not all, scientific tests involved objective measurements such as blood or genetic typing or gunshot residue. In a polygraph test, the bodily response of the examinee to his answers is dependent upon the subjective interpretation thereof by the examiner. In as much as the test is not perceived by the profession to be reasonably reliable, its admissibility is limited in Ohio to situations where the parties stipulate to its admission.

*State v. Davis*, 62 Ohio St.3d 326, 341, 581 N.E.2d 1362 (1991).

{¶ 46} In this case, once the state became aware of the possibility that Newell might have undergone a polygraph test, the prosecutor contacted the polygrapher, who was an FBI agent that was present during some of Newell's interviews. The

polygrapher checked his records and discovered that he had given Newell a brief exam. The polygrapher asked Newell two questions: "Did you shoot [B.F.]?" and "On August 19th, did you shoot [B.F.]?" Newell answered "No" to both questions and the examiner determined that Newell was being deceptive.

{¶ 47} This alleged discovery violation does not fall under the purview of *Brady* because the polygraph report was disclosed to defense counsel during trial. In addition, Newell does not claim that he was going to stipulate to the admission of the polygraph results; therefore, the polygraph results would not have been admissible at trial. His bare assertion that the results were "potentially useful" does not mean that the material was exculpatory. Morever, he has not shown that the evidence was material to a finding of guilt or that there is a "reasonable probability" that the outcome of trial would have been different had the polygraph results been disclosed before trial.

### b. Crime scene visit

{¶ 48} During Newell's cross-examination of Detective Lundy, the detective testified that he took Newell to the crime scene. That visit was not disclosed to defense counsel before trial; it was not contained in any of the police reports and the detective did not video or tape record any part of the crime scene visit. Newell claims that had defense counsel known of this visit to the crime scene, counsel would have challenged the admissibility of Newell's confession and investigated whether Detective Lundy's conduct was inappropriate or coercive.

{¶ 49} Detective Lundy testified that he had Newell's consent to take him to the crime scene; the detective testified that consent is required in order for an officer to take a jailed suspect to a crime scene. The detective testified that he took another detective along and "probably" informed his commander that he was taking Newell to the crime scene.

{¶ 50} They remained on the scene for less than five minutes. According to Detective Lundy, he took Newell to the crime scene because Newell was claiming that Doss was on the scene of the shooting and had driven to the scene. Newell told the detective that, at the time of the shooting, Doss's car was "present, facing the opposite direction." According to the detective, "[w]e were just trying to get a better understanding of which way cars were facing and where [B.F.'s] body was laying."

{¶ 51} As with the polygraph results, we find no *Brady* violation because the information was disclosed to defense counsel during trial. Newell has not shown that his visit to the crime scene was material evidence, that is, that there is a reasonable probability that the result of the proceeding would have been different had defense counsel known of the crime scene visit prior to trial.

### c. DNA evidence

{¶ 52} During trial, it came to defense counsel's attention that the police had secured a buccal swab from Newell. Detective Lundy testified that he submitted Newell's standard to BCI. BCI forensic scientist Farinacci testified that she received the standard but returned it to the police department with a note stating that "written authorization from the prosecutor is required before testing can begin on

these samples." The BCI scientist that performed the DNA analysis on the firearm recovered from Woods's house did not have Newell's standard for comparison; BCI scientist Nelsen-Rausch testified that although Newell's DNA standard was requested, she never received the standard from the East Cleveland Police.

{¶ 53} Newell claims that the failure to disclose the existence of the swab was done in bad faith. Newell further contends that all DNA evidence should have been excluded from trial because Newell's DNA standard was never tested.

{¶ 54} In *State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583, ¶ 18, this court found that the defendant's right to a fair trial was not violated when the state failed to turn over DNA evidence. During trial, the prosecutor learned that a DNA sample found in the backseat of the car where the victim was found matched someone other than the defendant. Defense counsel claimed that the discovery of the DNA bolstered its defense and argued that it would have investigated the other individual more fully if counsel had known that his DNA was in the car.

{¶ 55} On appeal, the appellant argued that he was denied due process of law and a fair trial because the state withheld exculpatory evidence. He further argued that the evidence was material evidence because it gave the defense a solid basis to argue that there was an alternate suspect. Therefore, the appellant argued, the prosecution's failure to disclose the evidence regarding the DNA was a clear *Brady* violation and a violation of his right to a fair trial. *Id.* at ¶ 19.

{¶ 56} This court found that the *Brady* rule did not apply because the alleged exculpatory evidence was not known to the prosecutor prior to trial. This court also

found that there was no violation of Crim.R. 16 because the state's failure to disclose was not a willful violation, the appellant had not demonstrated how the knowledge of the DNA would have benefitted him in his defense, defense counsel did not request a continuance for further investigation once he became aware of the evidence, and the appellant did not demonstrate that he was prejudiced by the state's failure to disclose the DNA evidence. *Id.* at ¶ 22.

{¶ 57} In this case, the state's failure to disclose the existence of a DNA swab did not violate Newell's right to a fair trial. Newell's DNA standard was initially sent to BCI but was returned to the East Cleveland Police Department. BCI requested the standard again, but the police did not send the swab to BCI a second time for testing or comparison. While the mix-up is concerning, Newell has not shown that the failure to disclose the existence of the DNA swab was a willful violation of Crim.R. 16. Moreover, Newell has not shown that this untested DNA was material to a finding of guilt and or a reasonable probability that the result of the proceeding would have been different had the existence of the DNA standard been disclosed.

{¶ 58} Nelson-Rausch testified that even if she had received Newell's DNA standard, it would not have changed any of her conclusions regarding the evidence because none of the bullet casings recovered from the crime scene had DNA that was suitable for comparison. In addition, although there was DNA recovered from the firearm taken from Woods's house, the firearm was ruled out as the murder weapon. In other words, there was no DNA recovered from the scene to compare to Newell's

DNA. Therefore, we do not find that Newell's right to a fair trial was violated by the failure to disclose the existence of his DNA standard to defense counsel.

### d. Police misconduct

{¶ 59} Within these assignments of error, Newell claims that the East Cleveland Police intentionally destroyed or hid evidence, disabled recording devices, withheld information from their police reports, and did these things in bad faith. Newell, however, does not support his claims with more than bare assertions. We, therefore, find no merit to his claims.

{¶ 60} The trial court did not err in denying Newell's motion for a mistrial or in deciding not to sanction the state for any alleged misconduct. The first, second, and third assignments of error are overruled.

## The record supports consecutive sentences

{¶ 61} In the fourth assignment of error, Newell argues that the imposition of consecutive sentences was not supported by the record.

{¶ 62} A trial court must make specified findings pursuant to R.C. 2929.14(C)(4) before it imposes consecutive sentences. *State v. Magwood*, 8th Dist. Cuyahoga No. 105885, 2018-Ohio-1634, ¶ 62. Specifically, the court must find that (1) consecutive terms are required to protect the public from future crime or to punish the offender, (2) consecutive terms are not disproportionate to the seriousness of the conduct and danger posed to the public, and (3) either the offender committed at least one offense while awaiting trial or sentencing, that multiple offenses were part of a course of conduct and the harm caused was so great

or unusual that a single term does not adequately reflect the seriousness of the offender's conduct, or that the offender's criminal history is such that consecutive terms are necessary to protect the public. R.C. 2929.14(C)(4); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 22, 26.

{¶ 63} A trial court is not required to state its reasons in support of its findings, nor is the court required to give a rote recitation of the statutory language, provided that the necessary findings can be found in the record and are incorporated in the sentencing entry. *State v. Blevins*, 2017-Ohio-4444, 93 N.E.3d 246, ¶ 15 (8th Dist.), citing *Bonnell* at ¶ 37.

{¶ 64} The court made the following findings when it sentenced Newell to consecutive terms of imprisonment:

> The court makes the finding as such that a consecutive sentence is necessary to punish Mr. Newell and to protect the public from future crimes and is not disproportionate to the seriousness of the conduct.
>
> And I find that one or more of the offenses were committed while Mr. Newell was on community control sanctions. Two or more of the offenses are part of one or more course of conduct, and that the harm caused is so great and unusual that a single prison term will not adequately reflect the seriousness of the conduct.
>
> Finally, Mr. Newell, your criminal history does demonstrate that consecutive sentences are necessary to protect the public, specifically because you were on community control sanctions on a weapons case and you were found guilty of that case.

{¶ 65} The court further found that Newell had a criminal history dating back to 2013, when he was a juvenile, and was currently on community control to the court for two separate cases. The court noted that Newell not only took B.F.'s

life and destroyed her family but also destroyed the lives of G.J., J.B., and T.G.  The court reasoned:

> You manipulated [B.F.].  You took advantage of her and you snuffed out her life when it was convenient for you.  When I consider the seriousness and recidivism factors, it doesn't get more serious than this, Mr. Newell. You lured [B.F.] out of the safety of her home where she was with her mom painting her nails.  You executed her on a dark sketchy street and then abandoned her lifeless body.  As if it couldn't be any worse, you shot her in front of three young boys with no regard [as to] how it would change their lives.

{¶ 66} The trial court stated all the requisite statutory findings and incorporated them into its sentencing journal entry.  Moreover, the record supports the trial court's reasoning.  Accordingly, the fourth assignment of error is overruled.

**Sufficient evidence supported Newell's convictions**

{¶ 67} In the fifth assignment of error, Newell claims that his convictions were not supported by sufficient evidence.

{¶ 68} A claim of insufficient evidence raises the question of whether the evidence is legally sufficient to support the verdict as a matter of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 69} As an initial matter, Newell does not challenge his conviction on Count 9, tampering with evidence or Count 14, having weapons while under

disability. Thus, we do not consider Counts 9 or 14 and affirm his convictions on those counts.

### a. Counts 1 – 6

**{¶ 70}** Newell first contends that his convictions on Counts 1 – 6 were not supported by sufficient evidence. To support this contention, Newell claims only that "[t]he evidence set forth at trial does not support each and every one of the material elements of the offenses beyond a reasonable doubt and the convictions must be vacated." Newell does not support his contention with further argument or citations to the record as required. *See, generally*, App.R. 12. We find that there was sufficient evidence to support the convictions on Counts 1 – 6.

### b. Count 8

**{¶ 71}** Newell next contends that there was insufficient evidence to support his conviction in Count 8, discharge of a firearm on or near prohibited premises. We disagree. R.C. 2923.162(A)(3) prohibits discharging a firearm upon or over a public road or highway. Based on the evidence outlined in this opinion, there was sufficient evidence that Newell fired a gun at B.F. on or over a public road. There was evidence presented that Newell shot B.F. while he was standing on First Avenue in East Cleveland. B.F. was found on the side of the road and the police observed tire impressions just off the side of the roadway, on the shoulder of the road. Five bullet casings were recovered near B.F.'s body. Based on these facts, there was sufficient evidence to find that the shots fired by Newell were discharged over a public road.

**c. Count 11**

{¶ 72} Newell claims that Count 11, aggravated theft with a one-year firearm specification, was not supported by sufficient evidence because there was no evidence that he participated or possessed a gun during the bank robbery. We disagree.

{¶ 73} Newell's mother, Tiffany, testified that her son told her that he was involved in a "bank robbery." Newell admitted to Detective Lundy that he was involved in the theft from Citizens Bank. The detective testified that Newell admitted the following: "Doss entered the Citizens Bank first in Northfield, Ohio. [B.F.] went in second. They were only inside the bank for minutes. And I believe Doss came back out first. Then all of a sudden he [Newell] seen [B.F.] running towards the car, and she jumped into the back of Jeff Doss's Nissan Juke." Newell told the detective that he "stayed out in the car as a look-out" and admitted that they had two firearms with them.

{¶ 74} R.C. 2911.01(A)(1) provides that no person, in attempting or committing a theft offense, or in fleeing immediately after the attempt or offense, shall have a deadly weapon on or about his or her person or under his or her control and either display it, brandish it, or use it. Further, R.C. 2923.03 provides that no person, acting with the kind of culpability required for the commission of an offense, shall aid or abet another in committing the offense.

{¶ 75} A defendant "aids or abets" when the defendant assists or facilitates the commission of a crime or promotes its accomplishment. *State v. Lane*, 11th Dist.

Lake No. 2004-L-211, 2006-Ohio-1269, ¶ 18. The mere presence of a defendant at the scene of a crime is insufficient to demonstrate the defendant aided or abetted the principal; "[r]ather, the state must establish that the offender 'took some affirmative action to assist, encourage, or participate in the crime by some act, deed, word, or gesture.'" *State v. Sims*, 11th Dist. Lake No. 2001-L-081, 2003-Ohio-324, ¶ 44, quoting *State v. Mootispaw*, 110 Ohio App.3d 566, 570, 674 N.E.2d 1222 (4th Dist.1996). "Aiding and abetting may be proven by both direct or circumstantial evidence and an individual's 'participation may be inferred from presence, companionship, and conduct before and after the offense is committed,' and also 'by overt acts of assistance such as driving a getaway car * * *.'" *State v. Hill*, 11th Dist. Ashtabula No. 2005-A-0010, 2006-Ohio-1166, ¶ 26, quoting *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158, ¶ 29 (8th Dist.).

{¶ 76} There was sufficient evidence to show that Newell was involved in the incident at Citizens Bank, serving as the look-out while Doss and B.F. were inside the bank. Moreover, Newell's own statement to Detective Lundy that the group had two firearms with them was sufficient evidence to support the firearm conviction.

{¶ 77} The fifth assignment of error is overruled.

**Newell's convictions were not against the manifest weight of the evidence**

{¶ 78} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether,

in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 79} Newell claims that there was no evidence to convict him of B.F.'s killing other than the testimony of biased witnesses: his mother, who lost custody of him as a child, the juvenile codefendants' whose testimony was compromised by their plea deals, and the testimony of police officers who "impermissibly and coercively obtained a confession."

{¶ 80} This court has consistently held that "the credibility of the witnesses are matters primarily for the factfinder to assess. The rationale behind this principle is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimonies are credible." (Citations omitted.) *State v. Hernandez*, 2018-Ohio-738, 107 N.E.3d 182, ¶ 28 (8th Dist.).

{¶ 81} The witnesses in this case were subjected to cross-examination and were thoroughly questioned regarding their alleged biases. Tiffany was cross-examined about losing custody of her son and about her decision to come forward to police to tell them about her son's involvement in B.F.'s death. The three juvenile eyewitnesses were questioned about their plea agreements with the state. The police

officers who testified were cross-examined regarding police procedures and the department's investigation of the case.

{¶ 82} Three juveniles witnessed Newell shoot B.F. multiple times, resulting in her death. Their testimonies were substantially similar to each other and to what Tiffany, Kieauntee, and Detective Lundy testified Newell told each of them: Newell shot B.F. five times, killing her, because he feared that B.F. would tell someone about the bank robbery.

{¶ 83} We therefore hold that the trial court did not lose its way in convicting Newell of having weapons while under disability nor did the jury lose its way in finding Newell guilty of aggravated murder, murder, kidnapping, felonious assault, improper discharge of a weapon, tampering with evidence, theft, and all accompanying specifications. We further find that there was no manifest miscarriage of justice entitling Newell to a new trial.

{¶ 84} The sixth assignment of error is overruled.

**Defense counsel was not constitutionally ineffective**

{¶ 85} In the seventh assignment of error, Newell claims that he was afforded ineffective assistance of counsel.

{¶ 86} To establish a claim for ineffective assistance of counsel, Newell must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant

demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. Where one prong of this test is not satisfied, a reviewing court need not address the other. *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989), citing *Strickland* at 697.

{¶ 87} Newell argues his trial counsel was ineffective because counsel did not preserve any evidence containing statements Newell made during the polygraph examination. He also contends that counsel did not ask for appropriate sanctions after counsel were made aware of discovery violations. We find evidence to the contrary; counsel asked for a mistrial after the parties found out about the polygraph evidence, and the trial court denied the motion.

{¶ 88} Newell has not shown that counsel had a duty to preserve evidence or exhibits that were not entered into evidence. Although Newell's attorney did not proffer the polygraph report, we do not find that counsel's representation fell below a standard of reasonableness on these points.

{¶ 89} Newell also argues that counsel was ineffective for not moving to suppress Newell's confession. The failure to file a suppression motion is not per se ineffective assistance of counsel. *State v. Edmonds*, 8th Dist. Cuyahoga No. 104528, 2017-Ohio-745, ¶ 23, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). Rather, counsel's failure to file a motion to suppress is ineffective assistance of counsel only if there is a reasonable probability that, had the motion

been filed, it would have been granted. *Edmonds* at *id.*, citing *State v. Watts*, 8th Dist. Cuyahoga No. 104188, 2016-Ohio-8318, ¶ 17.

{¶ 90} To determine whether a confession was involuntary, this court considers the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. However, a court will not conclude that a waiver was involuntary "unless there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35; *see also State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001) (finding that a reviewing court need not assess the totality of the circumstances unless the court finds that the tactics used by the detectives were coercive).

{¶ 91} Here, counsel was not ineffective for failing to file a motion to suppress Newell's confession because there was no evidence that Newell's confession was coerced. Newell was 20 years of age at the time of his arrest. He had an 11th grade education and had a lengthy history of criminal conduct and interaction with law enforcement. Detective Lundy testified that the interviews with Newell each lasted 30 to 60 minutes and he was offered bathroom breaks, food, and drinks during the interviews.

{¶ 92} Newell has not alleged that he was mistreated or threatened and has provided no evidence to sustain his bare allegation that he was coerced into confessing to B.F.'s murder.

{¶ 93} Newell cannot demonstrate that a motion to suppress would have been granted had such a motion been filed. Accordingly, counsel's performance did not fall below an objective standard of reasonableness, thereby failing the first prong of *Strickland*. Because the first prong of *Strickland* is not satisfied, we need not address the second prong.

{¶ 94} The seventh assignment of error is overruled.

**Cumulative error doctrine does not apply**

{¶ 95} In the eighth assignment of error, Newell argues the cumulative effect of the errors that occurred during the trial deprived him of a fair trial.

{¶ 96} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent." *State v. Allen*, 8th Dist. Cuyahoga No. 102395, 2016-Ohio-102, ¶ 53, citing *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

{¶ 97} Newell does not identify any additional errors within this assignment

of error that were not raised in previous assignments of error. Because this court has found Newell's arguments with regard to his other assignments of error meritless, the cumulative error doctrine does not apply.

{¶ 98} Therefore, the eighth assignment of error is overruled.

{¶ 99} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

LARRY A. JONES, SR., JUDGE

PATRICIA ANN BLACKMON, P.J., and
ANITA LASTER MAYS, J., CONCUR