[Cite as *State v. Stone*, 2014-Ohio-4803.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100794**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**CLEVE L. STONE**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-11-554536-A

**BEFORE:**    Jones, J., Boyle, A.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**   October 30, 2014

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

BY:    Erika B. Cunliffe
            Paul Kuzmins
Cuyahoga County Public Defenders
310 Lakeside Avenue
Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Andrew T. Gatti
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Cleve L. Stone appeals from his theft conviction. He contends that his trial counsel was ineffective. For the reasons that follow, we affirm.

## I. Procedural History

{¶2} In October 2011, Stone was charged with grand theft relating to an incident that occurred in August 2011 at his place of employment, Federal Metal. Stone rejected the state's plea deal, maintained his innocence, and the case proceeded to a jury trial. After the state presented its case, the defense moved for a Crim.R. 29 judgment of acquittal, which the trial court denied. The defense did not present any witnesses. The jury found Stone guilty of grand theft as charged. The trial court sentenced him to a year and a half of community control sanctions and ordered that he pay $7,771.95 in restitution to Federal Metal.

## II. Trial Testimony

{¶3} Federal Metal was in the business of purchasing metals from large scrap processing companies, copper mills, and brass mills, and melting the metal down into what is known in the industry as "ingots," which the company would then sell for use in a variety of products.

{¶4} When exiting from the rear of the company's building, there was a lot, the end of which was fenced and gated. Outside of the gate was a service road, which was utilized by drivers of semi-trailer trucks when they would make deliveries. Both Dean Turk, the shift supervisor on duty at the time of the incident, and Peter Nagusky, the president of the company, testified that there was never any reason why an employee would need to be back by the gate in the performance of his duties. Deliveries were made at the dock of the building and relative to outdoor work, it was performed in and around the dock area.

{¶5} Stone's duties at the company included operating a forklift to transport the metals, generally either for separation of the various metals or to the furnace to be melted.

{¶6} Turk, the supervisor on the evening in question, testified that, as was part of his responsibilities, he was walking around the outside of the business to make sure it was secure and any employees who were working outside were doing their work. Turk testified that as he walking to the back lot, he heard a "loud noise of crashing." As he walked to investigate, Turk saw Stone "coming back through the gate" driving a fork truck with a box on the forklift. Turk further testified that he saw a white pick-up truck on the service road. There was a man standing by the truck and when he saw Turk, he got in the truck and drove away.

{¶7} Turk questioned Stone about what was going on and Stone told him that "security was back there." Turk testified that the company did not have separate security personnel, however. Further, both Turk and Nagusky testified that the company only had security cameras by the building, and not by the fence and gate.

{¶8} Turk examined the box Stone had on his forklift. The label on the box indicated that it contained 1,981 pounds of copper. The box only contained one brick of copper, however, which Turk knew did not weigh that amount. Turk also found scraps of copper just outside of the gate, which was unusual, as corroborated by Nagusky. Turk immediately suspended Stone, and Stone left. Turk called Nagusky and the police.

{¶9} Nagusky and the police arrived at the business. Nagusky weighed the brick that had been in the box on Stone's forklift; it weighed 62 pounds. Nagusky testified that the business paid $4.07 per pound for the copper in that box, and 1,919 pounds was missing.

### III. Law and Analysis

{¶10} In his first two assignments of error, Stone contends that his counsel was

ineffective because she: (1) "failed to object to inadmissible hearsay and commentary on Mr. Stone's post-accusation silence" and elicited "testimony of the same during cross-examination"; and (2) "failed to meaningfully participate in voir dire." In his third assignment of error, Stone contends that the "cumulative mistakes of trial counsel" denied him a fair trial.

{¶11} We review alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to these cases, in order to reverse a conviction based on ineffective assistance of counsel, a defendant first "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland* at 688. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.

{¶12} "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Furthermore,

> [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

{¶13} With the above-stated in mind, we consider Stone's contentions.

**Post-Accusation/Pre-Arrest Silence**

{¶14} Despite how Stone's first assignment of error is captioned, he contends that his counsel was ineffective because she "initiated and carried-on a lengthy conversation with Peter Nagusky regarding Mr. Stone's failure to cooperate with the police investigation and the internal

* * * investigation." According to Stone, "[i]n essence, [his] own lawyer introduced evidence of [his] pre-arrest silence." Upon review, the state, not Stone's counsel, initiated the line of questioning; but regardless of who initiated it, we find no error.

{¶15} On direct examination, both Turk and Nagusky testified that on the evening of the incident, after the theft was discovered, the police were called to the business. Turk, who was the state's first witness, testified that after he confronted Stone, he told him he was suspended pending investigation and Stone left. When asked if he had seen Stone since, Turk responded "[n]ot until today."

{¶16} On cross-examination, defense counsel questioned Turk as to why, if he thought Stone had stole the copper, he would let him go and then call the police. Turk responded that he "really didn't know what to do with him at that point," and that when he suspended him he "told him [he] would talk with him and ask him why and what he was doing." Thus, presumably, Turk intended to talk to Stone at a later time.

{¶17} On direct examination of Nagusky, the assistant prosecuting attorney questioned Nagusky as to why the company decided to involve the police rather than just proceed with an internal investigation, as had been intimated to Stone. Nagusky answered:

> Our efforts from our staff to contact Cleve Stone went unanswered so we couldn't interview Cleve about the matter and nobody stepped forward. We were suspicious that maybe there were others involved that may have had knowledge, and so we were hopeful that employees would cooperate, but failing being able to reach Cleve Stone and failing to find out any more information from our employees we decided to report it * * * to begin the investigation of Cleve.

{¶18} Nagusky elaborated that the company attempted to contact Stone the day following the incident, but was unsuccessful and, therefore, decided to pursue an investigation with the assistance of law enforcement.

{¶19} On cross-examination, defense counsel questioned Nagusky if Stone had been paid for the work he did prior to his employment relationship with the company ending. Nagusky responded, "[o]h sure." Counsel continued the line of questioning, asking if there was a time shortly after the incident that Stone came into the business looking for his paycheck. Nagusky answered that he did not know anything about that.

{¶20} Based on the above testimony, it was not defense counsel who initiated testimony about Stone's post-accusation silence. It was first intimated on the direct examination of the state's first witness, Turk, when he testified that he told Stone when he suspended him that he wanted to talk to him about the incident, but did not see Stone again until the time of trial. Further, in regard to Nagusky's testimony, the issue was again initiated by the state on direct examination, not defense counsel.

{¶21} The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This provision applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

{¶22} In *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, the Ohio Supreme Court addressed the issue of pre-arrest silence vis-a-vis one's Fifth Amendment rights. The court held that the "use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Id.* at ¶ 38.

{¶23} In *Leach*, two women called the police and accused the defendant of attempted rape and other crimes. During the state's case-in-chief, the police investigator testified that one of the victims had provided him with the defendant's phone number. The investigator called the defendant and made an appointment to talk with him the next day. The investigator testified

that the defendant did not keep the appointment, and that the defendant had left a message on the police answering machine that he wanted to speak with an attorney before talking with the police.

{¶24} The court found that the state violated the defendant's Fifth Amendment rights, stating the following:

> The state in this case presented testimony that [the defendant], who had not yet been arrested or *Mirandized*, remained silent and/or asserted his right to counsel in the face of questioning by law enforcement. This testimony was clearly meant to allow the jury to infer [the defendant's] guilt. Otherwise, jurors might reason, [the defendant] would have offered his version of events to law enforcement.

*Id.* at ¶ 25.

{¶25} The *Leach* court, however, recognized two exceptions for the use of pre-arrest silence: (1) as impeachment evidence[1] (*id.* at ¶ 21-22) and (2) as evidence of the "course of the investigation." *Id.* at ¶ 32.[2] The latter exception applies here.

{¶26} The testimony about Stone's silence was first elicited by the state. It was not elicited, however, as substantive evidence of his guilt. Rather, it was elicited to explain to the jury why, despite Turk telling Stone that he would talk to him about the incident, he never did and, instead, the company initiated a police investigation.

{¶27} Moreover, in regard to defense counsel's failure to object, the record demonstrates that counsel had a strategy: she was attempting to discredit the company's contention that after Turk suspended Stone on the evening of the incident, he never made himself available to the company. According to counsel's line of questioning, it was the defense's position that Stone had not been fully paid for his work and he went to the company to inquire about his paycheck,

---

[1] Following *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).

[2] The court held that the sergeant's testimony in that case that he had made an appointment to meet with the defendant but the appointment was not kept was "legitimate." *Leach* at ¶ 32.

thus making himself available for at least an attempt of a company representative to question him.

{¶28} On this record, trial counsel was not ineffective in her handling of the testimony regarding Stone's pre-arrest silence, and the first assignment of error is therefore overruled.

**Voir Dire**

{¶29} In his second assignment of error, Stone contends that his trial counsel was ineffective because she "failed to meaningfully participate in voir dire." Specifically, counsel: (1) only asked two questions, (2) did not use any peremptory challenges, (3) "told the jury Stone may not be innocent," and (4) failed to object to the non-presence of two jurors.

{¶30} It is well-established that reviewing courts should decline to "second-guess trial strategy decisions" or impose "hindsight views about how * * * counsel might have voir dired the jury differently." *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998); *see also State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 139; *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

{¶31} "Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors." *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). "The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. * * * [T]he selection process is more an art than a science, and more about people than about rules." *Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir.1989). For these reasons, it is recognized that "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *Murphy*, 91 Ohio St.3d at 539, 747 N.E.2d 765.

{¶32} Upon review, we do not find that trial counsel was ineffective during voir dire because she only asked two questions and did not exercise any peremptory challenges.

{¶33} This was a relatively straightforward case: the state alleged that copper was missing from a delivery box that was on a forklift truck that Stone was operating. The trial court thoroughly questioned the venire. (*See* tr. 4-80.) The assistant prosecuting attorney likewise throughly questioned the venire. (*See* tr. 85-113.) Defense counsel acknowledged that the panel had been throughly questioned: "Ladies and gentlemen of the jury, the Judge and my honorable opponent * * * [have] done such a great job in interrogating each and every one of you that I really don't have any questions."

{¶34} Counsel, however, asked arguably the most important questions: (1) "I just want to ask you generally if all of you would be able to be fair and impartial to my client?" and (2) "* * * as my client sits here today, is there anybody right now that would say he was guilty?" Further, counsel reminded the panel that only if the state reached its burden of proof beyond a reasonable doubt on each and every element could they find Stone guilty.

{¶35} Moreover, defense counsel had a strategy in not exercising any peremptory challenges.[3] Specifically, five of the twelve jurors had financial backgrounds. Defense counsel believed that to be good for her client: "And I am loving this with all the CPAs, because I know you are going to hold them to that burden of precision, of the accuracy, of how you track inventory and how you know something is missing."

{¶36} Further, although defense counsel stated that one juror, a practicing CPA, "scared" her "a little bit" because he described himself as "conservative," counsel reasoned through it,

---

[3]The state also did not exercise any peremptory challenges.

saying:

> I am conservative, too. I like to dress conservative. I tell my children, try to be conservative in their actions so that 20 years later something doesn't come back to haunt them. But I love the fact that as a conservative, this CPA, you are going to hold the State to its burden of beyond a reasonable doubt.

{¶37} On this record, defense counsel was neither ineffective on her questioning of the venire nor for choosing not to exercise any peremptory challenges.

{¶38} In regard to what Stone characterizes as his counsel stating that he may not be innocent, the statement must be placed in context. During voir dire of the alternate jurors, defense counsel asked: "So do you understand that as my client sits here today * * * [he] is not guilty?"

{¶39} Defense counsel then stated and reiterated the question as follows:

> There is a difference, and the Judge will explain it, between being innocent and being not guilty. Not guilty is a legal term which means each and every element hasn't been proven beyond a reasonable doubt. So he may not be pure as the driven snow, but do you understand that until he is proven guilty beyond a reasonable doubt he is not guilty?

{¶40} Counsel's statement was, in fact, true, and when placed in context, there was nothing ineffective about her making it.

{¶41} We likewise find nothing ineffective about counsel's failure to object to two jurors being excused during voir dire to go to the restroom. The first instance occurred when juror number eight requested to be excused after the state completed its voir dire of him. Although the record does not indicate when he returned to the courtroom, there was no prejudice to Stone. As stated above, defense counsel did not have any specific questions for any one juror, and her admonishments mirrored what had already been thoroughly addressed by the court and/or the state.

**{¶42}** The second instance occurred when the alternate juror number one, after being voir dired by the court, was excused for the restroom while the court was conducting its voir dire of alternate juror number two. The record clearly demonstrates that alternate juror number one was only briefly out of the courtroom[4] and was back during both the state and defense's voir dire. Further, alternate juror number one never deliberated.

**{¶43}** In light of the above, defense counsel was not ineffective for failing to object to the excusal of two jurors to use the restroom.

**{¶44}** We also find Stone's final claim, that the cumulative errors of counsel deprived him of a fair trial, to be without merit. Pursuant to the cumulative error doctrine, a conviction will be reversed where the "cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). The doctrine is not applicable, however, when the alleged errors are found to be nonexistent. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

**{¶45}** Having found no errors, the cumulative error doctrine is inapplicable to this case.

**{¶46}** Stone's three assignments of error are overruled.

**{¶47}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

[4]It is indicated on page 127 of the transcript that he left and indicated on page 128 that he returned.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the

Rules of Appellate Procedure.

_____
LARRY A. JONES, SR.,   JUDGE

MARY J. BOYLE, A.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR