[Cite as *State v. Collins*, 2020-Ohio-4136.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                    :

                                         No. 108878

    v.                                            :

SENYON L. COLLINS,                             :

    Defendant-Appellant.               :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 20, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-627168-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anthony T. Miranda, Assistant Prosecuting Attorney, *for appellee.*

Jennifer N. McTernan L.L.C., and Jennifer L. McTernan, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Senyon Collins appeals after a jury convicted him of felonious assault, improper discharging firearm at or into habitation or school, discharge of firearm on or near prohibited premises and two counts of improperly

handling firearms in a motor vehicle. Each count contained a one-, three- and five-year firearm specification. The trial court sentenced Collins to an aggregate 14 years in prison. We affirm.

## I. Factual Background and Procedural History

{¶ 2} Tuquisha Oliver and Collins were romantically involved, on and off, for about a year. During that time, they believed that Collins had fathered a child born of Tuquisha. However, following a paternity test, it was determined that Collins was not the child's father.

{¶ 3} The paternity test was taken at the behest of codefendant Brittany Lawson. Collins and Lawson were romantically involved prior, and subsequent, to his relationship with Tuquisha.

{¶ 4} When Collins learned that he was not the child's father, he was angry and engaged in several verbal altercations with Tuquisha. One evening when Tuquisha was staying at her mother, Rochelle Oliver's, home in Cleveland Heights, Ohio she talked with Collins on the phone. She informed him that she had permitted another man to visit with the child. This angered Collins, she explained, because he did not like the child being around other men. He yelled at her and told her he was coming over to the home. He did not appear that evening, but showed up the following morning driving a gray truck. Rochelle answered the door and told Collins that Tuquisha was not present even though she was in another room. Collins left shortly thereafter and when he did, Tuquisha and Rochelle went to the home of Tunisha Oliver, Tuquisha's sister, in Euclid, Ohio

{¶ 5} According to Tuquisha, she and Rochelle stopped briefly at Tunisha's house before proceeding to a dental appointment. While en route to the appointment, Rochelle received a call from Tunisha who was in tears. Collins, accompanied by Lawson, had come to the Tunisha's home looking for Tuquisha and, when told she was not there, he pointed a gun at Tunisha while seated in his gray truck and he proceeded to fire a single round into the house.

{¶ 6} Tunisha called 911 after she called her mother. She reported that "my house has been shot up" and that "my sister's boyfriend" was the person who did it. Tunisha testified that at the time of the crime she did not know Collins' legal name, but confirmed that she was "a hundred percent sure" that it was he who fired the shot.

{¶ 7} The bullet struck the house near Tuquisha's room there. Officer Trevor Thomas testified that when he arrived on the scene Tunisha was "visibly upset." Thomas observed three children playing in the house, none of whom were injured. He described "what appeared to be a bullet hole in the second floor window sill," although no bullet was recovered.

{¶ 8} Detective Joshua Schultz testified as to his experience with firearms and ballistics, including the fact that he had been a military sniper and that he has been trained in shooting incident reconstruction. Schultz had familiarity with trajectory ballistics and the effect on different mediums when struck by a bullet.

{¶ 9} Schultz assessed the defect in the window sill and described "some tearing from the aluminum siding, as, you know, a high velocity projectile would

proceed through a medium." He observed "shiny aluminum inside the impact site" which indicated that the damage occurred recently and that it was caused by a bullet. Schultz confirmed that it was "very common" for this kind of damage to be caused by a bullet.

{¶ 10} The day trial was set to begin, the prosecutor informed the court of a discovery issue. Collins had not been given three pieces of evidence: (1) surveillance video footage taken from a gas station near Tunisha's house that depicted a gray truck, (2) a video recording of Lawson's police interview and (3) Lawson's cell site location data obtained from a cell phone company that showed her location was consistent with the crime. The prosecutor accepted responsibility for the failure to provide the evidence and asserted that it was an unintentional oversight. Collins did not suggest otherwise.

{¶ 11} Although Collins only received this evidence on the day of trial, he admitted he had previously received the detective's report that referred to this evidence. The trial court conducted a hearing and inquired about the nature of the violation and the evidence. The court gave Collins an opportunity to review the new evidence and stated that if there was anything prejudicial or materially inconsistent with the detective's report, Collins could seek a continuance. Collins did not identify anything prejudicial or materially inconsistent and he did not seek a continuance.

## II. Assignments of Error

{¶ 12} Collins asserts five assignments of error:

1. Defendant-appellant's rights to due process and a fair trial were violated when the state failed to provide discoverable evidence to defense prior to the day of trial.

2. The trial court abused its discretion in failing to adequately address the state's discovery violations.

3. The trial court abused its discretion in failing to grant defendant's motion for a mistrial after a state's witness testified in front of the jury regarding defendant-appellant not speaking to law enforcement.

4. Defendant-appellant was denied the effective assistance of counsel in violation of Amendments V, VI, and XIV of the United States Constitution, and Article 1, Sections 10 and 16 of the Ohio Constitution.

5. The jury found against the manifest weight of the evidence that the defendant-appellant committed the acts alleged in Counts 1, 2, 3, 4 and 5 of the indictment.

## 1. Discovery Violation

{¶ 13} In the first assignment of error, Collins argues that the state violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by providing him additional discovery the morning trial was set to begin.

{¶ 14} "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment * * *." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A *Brady* violation occurs where suppressed exculpatory evidence is discovered after trial. *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528, ¶ 164. There is no *Brady* violation where evidence is disclosed or introduced during trial. *Id.*

{¶ 15} Here, the discovery materials were provided to Collins prior to trial. As such, *Brady* was not implicated. *See State v. Mills*, 8th Dist. Cuyahoga No.

90383, 2008-Ohio-3666, ¶ 11. Moreover, we note that Collins merely assumes, and does not explain how, the evidence was favorable and material to guilt or punishment. *See Brady* at 87.

{¶ 16} We overrule the first assignment of error.

## 2. Discovery Violation Sanction

{¶ 17} In the second assignment of error, Collins argues that the trial court abused its discretion by failing to adequately address the discovery violation. He asserts that the court should have delayed trial so that he could review the newly produced discovery materials. He claims that delaying trial would have given him the opportunity to "seek out review by an independent expert if necessary" to analyze Lawson's cell site location data.

{¶ 18} A trial court enjoys broad discretion in regulating discovery and, where a discovery violation has occurred, in determining the appropriate sanction. *State v. Smiler*, 8th Dist. Cuyahoga No. 100255, 2014-Ohio-1628, ¶ 13, citing *State v. Wiles*, 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1991). A trial court abuses its discretion where it makes an arbitrary, unconscionable or unreasonable decision. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. An abuse of discretion includes a situation where the trial court engaged in an unsound reasoning process. *Id.*

{¶ 19} Crim.R. 16(L)(1) details the trial court's authority to issue orders in response to a party's failure to comply with its discovery obligations. *Id.* at ¶ 33. Where a party fails to comply with the discovery rules, the court has discretion to

order the party to produce the discovery at issue, prohibit the party from introducing the nondisclosed material into evidence, grant a continuance or "make such other order as it deems just under the circumstances." Crim.R. 16(L)(1).

{¶ 20} The Supreme Court has identified three factors that should inform a trial court's decision to sanction the state in the event it commits a discovery violation:

> (1) [W]hether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced.

*Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), at the syllabus. Put differently, "[t]he [trial] court does not abuse its discretion in admitting evidence undisclosed in discovery unless the record shows that the prosecutor's discovery violation was willful, that foreknowledge would have benefitted the accused in preparing his defense, or that the accused was unfairly prejudiced." *State v. Haddix*, 12th Dist. Warren No. CA2011-07-075, 2012-Ohio-2687, ¶ 39, quoting *State v. Otte*, 74 Ohio St.3d 555, 563, 660 N.E.2d 711 (1996).

{¶ 21} In addressing a discovery violation, the trial court "must inquire into the circumstances surrounding [the] violation, must balance the competing interests, and '*must impose the least severe sanction that is consistent with the purpose of the rules of discovery*.'" (Emphasis sic.) *Darmond* at ¶ 21, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 5, 511 N.E.2d 1138 (1987). If the trial court failed to properly cure a discovery violation we consider whether any resulting error

was a harmless error. *State v. Newell*, 8th Dist. Cuyahoga No. 106584, 2019-Ohio-976, ¶ 42, citing *Middleburg Hts v. Lasker*, 2016-Ohio-5522, 76 N.E.3d 372, ¶ 16 (8th Dist.), (permitting an undisclosed witness to testify was harmless error where the testimony was merely cumulative).

{¶ 22} In this case, before the jury was selected, on the day trial was scheduled to begin, the prosecutor informed the court of an issue with discovery, because she had that day produced three additional pieces of discovery: (1) surveillance video footage from a gas station near the crime scene at the relevant time, (2) a video recording of Collins' codefendant, Brittany Lawson's police interview and (3) Lawson's historic cell site location data.

{¶ 23} The court conducted an extensive hearing into the attendant circumstances including discussion of the evidence and the nature of the violation, hearing argument from both parties. The prosecutor stated that the detective's report "included narration of all the evidence" that she provided to Collins earlier that day. Collins admitted that he was in possession of the detective's report.

{¶ 24} The prosecutor informed the court that her failure to provide the evidence to Collins was unintentional. Collins' attorney did not dispute this, and observed that she was a "good prosecutor." The prosecutor explained that multiple attorneys had worked on the case before her and that she herself had received the video recordings that same day, shortly before she produced it to Collins. Nevertheless, she accepted responsibility for the error.

{¶ 25} The court inquired into the nature of the videos. The prosecutor stated that only a few seconds of the gas station surveillance video were relevant, depicting a gray truck in the vicinity of the crime that was described as matching Collins' truck. As to Lawson's recorded police interview, the court inquired whether the prosecutor was planning on calling Lawson as a witness. The prosecutor indicated that Lawson would be testifying at trial and was providing her testimony in exchange for a diversion agreement and confirmed that Lawson's statement was contained in the detective's report that was in Collins' possession. Collins agreed that Lawson's statement was reflected in the detective's report.

{¶ 26} Addressing the cell site location data, the prosecutor stated that the records indicated that Lawson was within four miles of the crime scene and that the detective's report reflected any probative information from the records. The court confirmed that "to the extent that [the prosecutor] would use any of [the cell site location information] and call [Lawson as a witness], that's already been provided to defense counsel."

{¶ 27} At multiple points during the hearing, the court addressed Collins and informed him that it would give him time to review the evidence before the jury was sworn "so if there is something that you can raise between now and tomorrow from the video that would materially prejudice you or information that you didn't already have through the detective report, then we'll address a Motion for Continuance at that time * * *." The court opined that, from the parties' statements it did not believe the discovery violation was intentional or malicious, but was rather a "mutual miss"

to the extent that Collins knew the evidence existed because of the detective's report and the prosecutor was unaware that Collins did not have it.

{¶ 28} The following day, before trial began, the court continued its inquiry into the discovery violation and asked whether Collins' counsel reviewed the video recordings and whether there was anything materially different from what was contained in the detective's report. Counsel stated that he did not review the gas station video but confirmed that "stills" taken from it did depict a gray truck.

{¶ 29} The court asked counsel if, after his review, he saw anything that was materially different from the detective's report, prejudicial or whether there was anything that would cause him to change his approach to the case. Counsel responded "[n]o, your Honor."

{¶ 30} The court turned to the video of Lawson's police interview and again inquired whether counsel found anything materially different from that which was recorded in the detective's report, prejudicial or that would make him approach the case differently.

{¶ 31} Counsel did not directly answer the question, instead noting that "new information" was contained in the video recording including statements about alleged conversations between the victims and Lawson. The court asked counsel if Collins wanted a continuance in light of this information or whether he would be able to proceed with trial and address any concern he had with Lawson or the victims via cross-examination. Counsel responded that the video contained "new information" and that he had not had the opportunity to "do the necessary follow-

up" with Lawson or the victims. Counsel also wanted Collins to have the ability to review the video. The court confirmed that Lawson and the victims were on the witness list and that counsel, therefore, had the opportunity to talk with them:

> There is nothing that prevents you from talking to any witness. The diversion agreement does not prevent you from speaking to [Lawson]. And if she chose not to speak to you, that's every right of any witness on the advice of counsel or not * * * but you do have these person's [sic] names on the witness list. The fact that two people that were known to each other after the incident; one called in and said, "I'm calling the police on you," I don't think demands further investigation more than being able to discuss it with them because they're on the witness list and call them and just discuss generally the case, but also this is cross-examination.

{¶ 32} The state sought to clarify that the "new information" Collins' counsel found in the interview video, stating:

> [A]lot [sic] of those facts are already within the police report * * * and that was provided to defense many months ago.

> Not only that, jail calls were provided and social media was provided, I believe back in January or February. The social media shows ongoing threats by the defendant provided by the victims so, you know, there is ongoing communication.

{¶ 33} The state then confirmed that "the sum and substance of what [Lawson] said in her interview is also the same thing that was provided elsewhere in other forms of discovery."

{¶ 34} The court agreed that Collins should have the opportunity to review the video and adjourned for a recess to provide Collins time to review the video of Lawson's interview. After the recess, the court addressed Collins' counsel:

> The Court: Okay. And so it's my understanding that the substance of [Lawson's statement] * * * was partially in the detective's supplement.

But the same substance or allegations or claims or basis for her statements were also found elsewhere in other discovery.

Counsel:      Yes, that's correct.

The Court:   Okay.  All right.  So then we can continue.

Counsel:      Yes, your Honor.

{¶ 35} Collins argues that the trial court erred because it did not delay trial in response to the discovery violation.  He claims, without offering any support or explanation, that the violation "materially altered" his trial strategy and denied him a fair trial.  We disagree.  Review of the record does not indicate that the prosecutor's failures were willful, that foreknowledge would have aided Collins in preparing his defense or that he was unfairly prejudiced.  *See Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971 at ¶ 35.

{¶ 36} We find nothing in the record to indicate that the discovery violation was willful.  To the contrary, and as the trial court observed, the violation appears to be unintentional.

{¶ 37} As to whether foreknowledge of the evidence would have aided his defense, we note that Collins admitted he was in possession of the detective's report that details the video and phone record evidence.  The trial court noted that Collins was thus on notice that the evidence existed.  This is not to suggest that it became Collins' burden to obtain the video recordings and phone records after he was made aware of them through the detective's report, or that such reference in a detective's report is tantamount to the evidence itself for discovery purposes.  *See State v. Wilson*, 8th Dist. Cuyahoga No. 97465, 2012-Ohio-3567, ¶ 18 (failure to disclose

audio recording of detective interview potentially to be used at trial violated Crim.R. 16; indication in detective's statement that recording existed does not shift burden to defendant to seek out recording). Nevertheless, in this case, the extent to which the detective's report detailed the video and phone records minimizes the potential impact of not having the evidence itself for defense preparation.

{¶ 38} Moreover, Collins does not actually claim to have suffered any unfair prejudice as a result of the discovery violation. Instead, he speculates that were the trial court to delay the trial he would have had more time for "adequate review" of the evidence, "additional discussions regarding trial strategy" and "an opportunity to seek out review by an independent expert if necessary." Collins does not explain how any of this speculation would have provided him any benefit.

{¶ 39} As discussed, the trial court afforded Collins and his attorney time to review the evidence and it ensured that the evidence was not materially different or prejudicial from what was contained in the detective's report or was otherwise information that "[he] should have known earlier." Collins did not identify anything of substance. He did not dispute the prosecutor's claim that the gas station surveillance video was merely cumulative of other evidence addressed in the detective's report that identified Collins and his truck at the crime scene, namely the victim's statement.

{¶ 40} With regard to Lawson's interview video, Collins agreed that the detective's report was only a partial reflection of the entire interview. However, he

admitted that anything in the video that was not reflected in the detective's report was otherwise established in discovery that he possessed.

{¶ 41} As to the cell site location data, Collins did not dispute that any relevant information was contained in the detective's report and that any information that the state would use had previously been provided to Collins.

{¶ 42} This was a minimal discovery violation. Nevertheless, even if we were to assume that the trial court failed to properly cure the discovery violation, the error would be harmless because, as discussed, Collins fails to identify any prejudice that resulted from the discovery violation. *See State v. Newell*, 8th Dist. Cuyahoga No. 106584, 2019-Ohio-976, ¶ 42.

{¶ 43} We overrule the second assignment of error.

## 3. Denial of Motion for Mistrial

{¶ 44} In the third assignment of error, Collins argues the trial court erred by denying his motion for a mistrial after Detective Schultz testified that his attempt to interview Collins was unsuccessful. Collins asserts that this testimony constitutes a violation of his Fifth Amendment right to remain silent.

{¶ 45} Collins argues that the detective impermissibly referred to his pre-arrest silence twice, once during his direct examination and again during his cross-examination. During his direct examination the prosecutor inquired about the course of the investigation and Schultz testified:

> So after identifying [Collins and Lawson] I attempted to reach out to
> them to set up potential interviews to get their side of the story, if there

was any foundation of the allegations against them at some point. I was unable to schedule those interviews.

{¶ 46} There was no objection. During cross-examination, in the midst of a line of questions relating to whether the detective was biased in his investigation, the following exchange occurred between Collins' attorney and Schultz:

Q. To the extent that you, as being a detective, the person that is unbiased and the person who is just supposed to call it just the way it is, you're the type of person you have to talk to everyone that provides information critical to your case because you're not on one side or the other.

A. Correct.

* * *

Q. So it's your job to interview people that provided information so you know the integrity of what you're receiving.

A. Correct. * * * But I also did attempt to have Mr. Collins and Ms. Lawson speak to me regarding this matter.

Collins' attorney objected.

{¶ 47} In general, "[u]se of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, at syllabus. However, one exception to this rule exists where the state uses a defendant's pre-arrest silence as evidence of the "course of the investigation." *Id.* at ¶ 32.

{¶ 48} In *Leach*, the defendant's conviction was predicated solely upon the credibility of the state's witness. *Leach* at ¶ 29. During trial, an officer testified that he contacted the defendant during the course of the investigation:

I asked [the defendant], I told him that I had been made aware that he wanted to talk to the police about what had occurred at the house that night, and I made arrangements. He said he would come in and talk to me at 2:30 in the afternoon [later that day].

*Id.* at ¶ 5. When the officer was asked whether the defendant kept the appointment or whether he had any further contact with the defendant, he testified:

No. * * * I believe I contacted him. Either I contacted him — I know he left a message on my machine in regards to he wanted to speak with an attorney before talking with the police.

*Id.* The Supreme Court found that the officer's testimony that the defendant had made an appointment to speak with police but had not kept that appointment was legitimate evidence as related to the course of the investigation. *Id.* at ¶ 32.

{¶ 49} In this case, the detective's statement during direct examination about being unable to schedule an interview with Collins and his statement on cross-examination about attempting to speak with Collins were admissible to explain the course of the investigation. *See State v. Stone*, 8th Dist. Cuyahoga No. 100794, 2014-Ohio-4803, ¶ 26 ("[T]estimony about defendant's silence] was not elicited * * * as substantive evidence of his guilt. Rather it was elicited to explain to the jury why * * * the company initiated a police investigation.").

{¶ 50} *State v. Jackson*, 8th Dist. Cuyahoga No. 88345, 2007-Ohio-2925, is instructive as to this point. In *Jackson*, a detective testified that during the course of a shooting investigation, he spoke with the defendant and attempted to set up an interview with him. The detective testified that the defendant missed several such appointments before finally coming to the police station for an interview. *Id.* On appeal, the defendant argued that his right against self-incrimination was violated

when the state introduced evidence of his initial refusal to speak with police. *Id.* at ¶ 25. This court rejected the argument, explaining:

> The testimony concerning the missed appointments was admissible to explain the course of the investigation. Unlike the testimony found impermissible in *Leach*, the testimony here did not involve defendant invoking his right to counsel. Conversely, the testimony that defendant had missed appointments is like the testimony the Ohio Supreme Court found to be legitimate in *Leach*.

*Id.* at ¶ 30.

{¶ 51} Similarly, in this case, the detective's testimony only involves his inability to set up an interview with Collins. There is no mention of Collins refusing and invoking his right to counsel. As such, the testimony was admissible to explain the course of the investigation. The trial court, therefore, did not err by denying Collins' motion for a mistrial based on his Fifth Amendment right to remain silent, because there was no such violation.

{¶ 52} We overrule the third assignment of error.

**4. Ineffective Assistance of Counsel**

{¶ 53} In the fourth assignment of error, Collins argues that he was denied the effective assistance of counsel based on counsel's response to the discovery issue that were the subject of the first two assignments of error. Collins argues that his counsel was deficient because he did not (1) request a delay in trial, (2) object to inclusion of the evidence or (3) move for a mistrial based on its inclusion.

{¶ 54} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984). To establish ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the trial would have been different. *Id.* at 687-688, 694; *see also State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 391 ("Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial."). "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 55} As discussed in the second assignment of error, the discovery violation in this case was minimal and was appropriately addressed. Collins has thus articulated no basis for us to conclude that his counsel's performance was deficient. Moreover, we note that aside from the mere statement that he was prejudiced by his counsel's actions, Collins has provided no explanation as to how he actually was prejudiced.

{¶ 56} We overrule the fourth assignment of error.

**5. Manifest Weight of the Evidence**

{¶ 57} In the fifth assignment of error, Collins argues that his convictions are against the manifest weight of the evidence.

{¶ 58} Evaluating a manifest weight of the evidence challenge requires this court to review the record, weigh the evidence and reasonable inferences, consider witness credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and thereby created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In conducting such a review, we remain mindful that witness credibility and the weight to be given to evidence are primarily assessments for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Reversal on the weight of the evidence is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 59} Collins attacks the quality of the gas station surveillance video and cell phone site location data and the conclusions that can be drawn from them. He asserts that the video is "grainy," and that, although it was clear enough to depict a gray truck, he notes that the detective admitted during his testimony he could not identify any occupant or make out the license plate number. These claims, and the extent to which they pertain to whether Collins fired a bullet into Tunisha's house-aside, the jury was free to accept or reject that the video depicted Collins' truck. Interpreted in any light, the video is not evidence that Collins did not shoot the house.

{¶ 60} As to the cell phone records, Collins admits that the records do show that Lawson's phone pinged towers near the crime at the relevant time, but notes that when the detective testified about these records he admitted that he did not personally compile the data, that he would not know if there was any error in the records and acknowledged he was not an "expert" in this kind of data interpretation. Again, the jury had the ability to draw its own conclusion from these records. We note that Lawson's testimony that she was present with Collins at Tunisha's house is undisputed. Moreover, as was the case with the surveillance video, the cell phone records are not evidence that Collins did not shoot the house.

{¶ 61} Collins asserts that Tunisha's testimony was not reliable or credible. To substantiate this claim, Collins notes that, after he purportedly fired the gun, Tunisha immediately called her mother rather than the police and that when she did call the police "one or two minutes" later, she identified the shooter as "[her] sister's boyfriend" rather than providing Collins' legal name. As noted, Tunisha testified that she did not know Collins' name when she called 911. Collins further complains that Tunisha alleged in a written statement that he and Lawson "kept calling and threatening her" but that she admitted during trial that neither Collins nor Lawson actually called her. Again, the extent to which any of this bears on Tunisha's credibility is a determination within the purview of the jury. Regardless, none of it constitutes evidence weighing against conviction.

{¶ 62} Collins asserts that there were "significant inconsistencies" between Tuquisha's and Rochelle's testimony, although he identifies only one. Tuquisha

claimed that after Collins left Rochelle's house, she and Rochelle briefly stopped at Tunisha's before going to a dental appointment and that Tunisha called Rochelle about the gunshot while they were en route. Rochelle's testimony, in contrast, was that she received Tunisha's call about the gunshot while they were en route to Tunisha's house. Our disagreement with Collins' characterization of this inconsistency as "significant" aside, this inconsistency is unrelated to whether Collins fired the shot and is not evidence weighing against conviction.

{¶ 63} Collins also attacks Lawson's credibility, claiming her testimony was "conflicted" because she "wanted to avoid a warrant and maintain her placement in the Diversion Program." Lawson testified that she thought she remembered "showing up at a house in Euclid," though she testified that she did not recall any details of the incident, including any conversation that transpired, whether anything was out of the ordinary or whether any weapon was present. She explained "I think I was on drugs or something." After further discussion between the prosecutor and Lawson the following exchange occurred:

Q. Okay. So now refreshing your memory, based on your interview with the detective and you telling him about the gun, you remember that there was a gun on March 6th of 2018?

A. Yeah, I guess.

Q. Yeah, you — I guess you remember there was a gun?

A. Yes.

Q. Do you remember who had the gun?

A. I didn't have it.

Q. Okay. Do you remember it being in the car or the pickup truck?

A. I said that.

Q. Yes?

A. Yes.

Q. Okay. Do you remember anybody holding it?

A. No.

Q. Do you remember Senyon Collins holding it?

A. No, I really don't remember.

Q. Okay. But you now remember the gun. Right?

A. Yes.

Q. You remember it being in the car. Right?

A. Yes.

{¶ 64} To the extent that any of Lawson's testimony conflicts with Tunisha's testimony about the incident that she was "a hundred percent sure" that Collins fired the shot into her house, it was the jury's obligation to resolve that conflict. We cannot say that in so doing the jury lost its way.

{¶ 65} It is the province of the jury to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). This is not the exceptional case where the evidence weighs heavily against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 66} We overrule the fifth assignment of error.

{¶ 67} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

PATRICIA ANN BLACKMON, P.J., and
RAYMOND C. HEADEN, J., CONCUR